**Rachelle HINES, as Special Administrator of the Estate of Clark Hines, Deceased, Plaintiff–Appellant,**

v.

**BRITISH STEEL CORPORATION, Defendant–Appellee.**

No. 89–2969.

United States Court of Appeals, Seventh Circuit.

Argued June 20, 1990.

Decided July 23, 1990.

As Amended July 27 and Aug. 2, 1990.

James L. Farina, Chicago, Ill., for plaintiff-appellant.

Duane C. Weaver, Harold L. Witsaman, Theodore C. Robinson, Ray, Robinson, Hanninen & Carle, Chicago, Ill., for defendant-appellee.

Before FLAUM and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

FLAUM, Circuit Judge.

Plaintiff-appellant, Rachelle Hines, appeals the district court's order granting defendant-appellee British Steel Corporation's (BSC) motion for summary judgment in this negligence action brought under Section 5(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b). The parties, by stipulation below, dismissed defendant ship, the M.S. Ravenna, with prejudice. Rachelle Hines brought the suit as special administrator of the estate of Clark Hines, a longshoreman who was killed in an accident aboard the M.S. Ravenna. We affirm.

## I. BACKGROUND

This case arose out of the death of Clark Hines (Hines), a longshoreman who was killed on October 3, 1987, while performing stevedoring activities aboard the M.S. Ravenna (the Ravenna) while it was docked at Iroquois Landing in Chicago. Hines was an employee of Ceres Terminals, Inc. (Ceres), an independent stevedoring concern. The Ravenna had been "time-chartered"[1] by BSC from the owner of the Ravenna, Roscoe Shipping, S.A., and had been docked in Chicago on October 1, 1987, to unload BSC cargo. British Steel had hired Ceres as an independent contractor to unload a cargo of steel. The Ravenna's Master (captain) and crew were employees of Roscoe Shipping.

At the time of the accident which caused Hines's death, Ceres had completed the unloading of British Steel's cargo into a barge owned by Caterpillar Corporation. Ceres employees, including Hines, were conducting clean-up of the Ravenna. The Ravenna contains five holds for cargo storage, each having a hatch at deck level through which cargo is loaded and unloaded using the ship's deck-level cranes. Hines, along with others, was working in hold number three cleaning up dunnage (pieces of lumber used to protect a ship's cargo from damage during transport). A full, strapped bundle of unused, new dunnage, owned by Ceres, that had been returned from the Caterpillar barge after it was loaded, lay on the Ravenna's deck. This bundle of dunnage was to be removed from the deck of the Ravenna and brought ashore.

Ceres employees had rigged Ceres-owned slings to the bundle of dunnage. A Ceres longshoreman secured the slings to one of the Ravenna's cranes. This crane, serving hold number three, was situated between hatch number three and hatch number two. The crane was able to be rotated in a 360 degree circle and was in good working condition. At the time, hatch number two was shut.

Captain Tore Sorenson, a Ceres Superintendent, was in charge of the stevedoring operations aboard the Ravenna. He was standing adjacent to hold number three as his longshoremen worked below. Another Ceres longshoreman acted as signalman directing the crane operator. He was also responsible for making sure that the load of dunnage was not swung over the open hatch of hold number three while men were working below and to warn the workers when a load was to be swung over the hatch. Swinging a load of cargo or dunnage over a hatch opening while men are working in the hatch is a prohibited activity, and Ceres crane operators are instructed not to do so. John Folan, BSC's cargo representative, was aboard the Ravenna during its journey, but was on shore at the time of the accident.

Although the crane operator could see the open hatch and the men working below, he lifted, without warning, the load of dunnage and swung it over hold number three. Captain Sorenson and others on the deck saw this and yelled a warning to the workers in the hatch. For reasons unknown, the bundle of dunnage then fell from the crane into the hold. The bundle of dun-

---

1. A "time charter" is "a contract to use a vessel for a particular period of time, although the vessel owner retains possession and control." Schoenbaum, *Admiralty and Maritime Law*, § 10–1 at 381 (West 1987). A vessel that is time chartered is "typically fully equipped by the owner, who is responsible for normal operating expenses, repairs, the crew's wages, and insurance. The charterer is responsible for expenses relating to the cargo that is loaded and the port's use." *Id.* at § 10–1 n. 10.

nage broke apart when it hit a dumpster in the hold. Some of the flying dunnage struck Clark Hines, and he later died.

Rachelle Hines filed this suit in the Circuit Court of Cook County, Illinois, but on June 1, 1988, BSC removed it to the United States District Court for the Northern District of Illinois. On June 30, 1989, BSC moved for summary judgment, arguing that BSC had no general duty to supervise the stevedoring operations aboard the Ravenna. Plaintiff responded that the charter agreement between BSC and the Ravenna's owners, together with the various agreements between BSC and Ceres regarding the Ravenna's cargo, evinced an intent by BSC to control and supervise Ceres's unloading operations.

On October 5, 1989, the district court granted summary judgment in favor of BSC. The court found that as a "time charterer," BSC was amenable to suit under the LHWCA.[2] The court then stressed that the Supreme Court's decision in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 172, 101 S.Ct. 1614, 1624, 68 L.Ed.2d 1 (1981), precluded any finding that BSC had "any general duty to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." The court rejected plaintiff's assertions that BSC had contractually assumed a duty of safe supervision. First, the court found that the language of the time charter agreement imposed no special duty on BSC to insure the safety of the longshoremen. Second, the court emphasized the uncontroverted deposition testimony from Captain Sorenson and from BSC's cargo superintendent, John Folan, which indicated that Folan took no part in the actual stevedoring activities and that any suggestions he made to the captain were advisory. This appeal followed. For the reasons dis-

cussed below, we affirm the district court's grant of summary judgment.

## II. ANALYSIS

### A. Standard of Review

A grant of summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact "exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Puckett v. Soo Line Ry. Co.*, 897 F.2d 1423, 1425 (7th Cir.1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If alternate inferences can be drawn from the available evidence, summary judgment is inappropriate. *LHLC Corp. v. Cluett Peabody & Co.*, 842 F.2d 928 (7th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988). On appellate review, we review the record and the inferences drawn therefrom in the light most favorable to the party opposing the motion. *Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570, 573 (7th Cir.1987). Review of the district court's findings is *de novo*. *Puckett*, 897 F.2d at 1425. We apply these standards in light of the substantive law applying to LHWCA cases. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). In reviewing the district court's decision, we must determine whether BSC, as time charterer, owed any duty to supervise stevedoring operations aboard the Ravenna. This is a question of first impression in this circuit.

---

**2.** BSC does not challenge the district court's finding that the corporation was amenable to suit under the LHWCA. Under 33 U.S.C. § 905(b), a longshoreman who is both covered by the LHWCA and injured due to the negligence of a vessel may file a negligence suit against the "vessel." Under the LHWCA, however, "vessel" is defined as the "vessel's owner, owner pro hac vice, agent, operator, charterer

or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21). A "time charterer" such as BSC is in this case, is not specified as being a "vessel;" however, courts have generally interpreted the statutory definition of "vessel" to include time charterers. *See, e.g., Woods v. Sammisa Co., Ltd.*, 873 F.2d 842, 846 n. 3 (5th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 853, 107 L.Ed.2d 847 (1990).

B. A Vessel's Duty of Care Under 33 U.S.C. § 905(b)

In *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court interpreted the extent of a vessel's liability under the 1972 amendments to Section 905(b). The Court explained that imposing on the vessel "a continuing duty to take reasonable steps to discover and correct dangerous conditions that develop during the loading or unloading process," would be inconsistent with congressional intent in amending the LHWCA. *Id.* at 169, 101 S.Ct. at 1623. Thus, the Court held that in the absence of a contract provision, positive law, or custom to the contrary, the shipowner "has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operation that are assigned to the stevedore." *Id.* at 172, 101 S.Ct. at 1624. The shipowner "is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself." *Id.* The shipowner also owes no duty to inspect or supervise the stevedore's cargo operations. *Id.* Rather, "the shipowner, within limits, *is* entitled to rely on the stevedore." *Id.* (emphasis in original). Although *Scindia* did not involve a time charterer, the principles discussed in the Supreme Court's opinion apply with equal force to the situation presented in this case.[3]

In this case, there was no evidence that the crane which dropped the dunnage that killed Clark Hines was not in good working order. In fact, the deposition testimony of the stevedore captain is to the contrary. Furthermore, the act of the crane operator in swinging a load of dunnage over hold number three while men were working below was unforeseeable. Finally, BSC's cargo representative was not on the boat at the time of the accident. Under these circumstances, *Scindia* forecloses liability on BSC absent a contract provision, positive law, or custom to the contrary. *Cameron v. Consolidated Grain and Barge Co.*, 654 F.2d 468, 471–72 (7th Cir.1981). Indeed, appellant argues that BSC, by its contractual arrangements with both the owner of the Ravenna and with Ceres, undertook operative control of stevedoring operations aboard the Ravenna and thereby assumed a duty to supervise and ensure the safety of the longshoremen who were engaged in cargo operations aboard the Ravenna at the time of the accident.

Appellant makes her argument on the authority of Restatement of Torts, Second, § 414, and its accompanying comments.

Section 414 of the Restatement provides:

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise his control with reasonable care.

The comments to Section 414 suggest, however, the parameters of the "retention of control" concept:

It is not enough that [the employer] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

---

**3.** The Fifth Circuit has noted its view that *Scindia* "does not set the duty of time-charterers. Though the Supreme Court used the word 'vessel' throughout its opinion, the context of the case, as well as the Court's alternate use of 'shipowner' throughout its opinion suggest that the duties prescribed in *Scindia* apply only to true owners." *Kerr–McGee v. Ma–Ju Marine Services, Inc.*, 830 F.2d 1332, 1340 (5th Cir. 1987). The Fifth Circuit went on in the *Kerr–McGee* case, however, to determine the time charterer's duty within the same analytical framework as the *Scindia* Court.

Restatement (Second) of Torts, § 414 comment (c).

Few courts have applied Section 414 in the context of a lawsuit under Section 905(b) of the LHWCA. In fact, in *Scindia,* the Supreme Court rejected the application of Restatement Sections 343 and 343A to actions under Section 905(b). The Fourth Circuit has interpreted *Scindia* as having rejected all land-based negligence standards in maritime cases, which would presumably include Restatement Section 414. *See Hodges v. Evisea Maritime Co., S.A.,* 801 F.2d 678, 683 (4th Cir.1986), *cert. denied,* 480 U.S. 933, 107 S.Ct. 1572, 94 L.Ed.2d 764 (1987). Actually, however, although the Supreme Court indicated that the standards under Section 905(b) "are not necessarily to be governed by principles applicable in non-maritime contexts," the Court did not reject the Restatement as a useful analytical tool outright. Rather, the *Scindia* Court found Restatement sections 343 and 343A were not helpful in that particular case. *Scindia,* 451 U.S. at 168 n. 14, 101 S.Ct. at 1622 n. 14. *See Hurst v. Triad Shipping Co.,* 554 F.2d 1237, 1248–53 (3rd Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977) (pre-*Scindia* case discussing Restatement (Second) Torts §§ 318, 343, 414, and finding that only Section 414 comports with congress's intent with regard to the liability of a vessel under the LHWCA).

Although we consider Section 414 to be helpful in explaining the contractual arrangements between employers like BSC and their independent contractors, such as Ceres, it does not address the contractual relationship between BSC and the owner of the Ravenna. Thus, comment c to Section 414 is relevant only to the extent its terms are implicated by the stevedoring agreements between BSC and Ceres. Our inquiry into the contract between BSC and Roscoe Shipping is governed by ordinary contract law. However, as the following analysis makes clear, the time charter agreement contains no indication that BSC intended to undertake any duty of care in addition to that imposed by *Scindia.* Nor do the stevedoring agreements between BSC and Ceres give BSC "control" over the

longshoremen activities aboard the Ravenna, as Section 414, Comment (c) defines the term.

## C. BSC's Duty of Care to Clark Hines

Appellant argues that Clause 8 of the charter agreement between BSC and Roscoe Shipping gave BSC control over the ship's master and the responsibility to "load, stow, trim, and discharge the cargo" under the direction and control of the master. She asserts that Clause 8, in conjunction with paragraph "j" of the instructions from BSC to the ship's Master shows that BSC took control of the stevedoring operations by its control of the Master. Paragraph "j" states that although BSC would appoint the stevedores, they would remain under the "direct control" of the Master who was instructed "to ensure that cargo is loaded in a safe and seamanlike manner."

> Clause 8 of the charter party provides: That the Captain shall prosecute his voyages with the utmost dispatch, and shall render all customary assistance with the ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, trim and discharge the cargo at their expense *but such stowage shall be conducted by and under the control of the Master and the Owners shall be responsible for the proper stowage and correct delivery of the cargo....*

(emphasis added). With the exception of the italicized language, which replaces deleted language in the contract, "under the supervision of the captain," Clause 8 is apparently a standard provision in time-charter agreements. *See e.g., Woods v. Sammisa Co., Ltd.,* 873 F.2d 842, 856–57 (5th Cir.1989) (addressing same clause); *Hayes v. Wilh Wilhelmsmen Enterprises, Ltd.,* 818 F.2d 1557, 1558 (11th Cir.1987) (same); *Spence v. Mariehamns R/S,* 766 F.2d 1504, 1507 (11th Cir.1985) (stating that the language in clause 8 is standard in time charter agreements).

The weight of post-*Scindia* authority indicates that the inclusion of Clause 8 in the charter agreement does not constitute a special contractual promise by the shipowner to the time charterer that the Captain would take direct responsibility for supervising the discharge of cargo. *See e.g., Woods,* 873 F.2d at 856–57; *Spence,* 766 F.2d at 1507; *Irby v. Tokai Lines,* 1990 WL 18880, 1990 U.S.Dist. Lexis 2116 (E.D.Pa. Feb. 23, 1990). *But see Turner v. Japan Lines, Ltd.,* 651 F.2d 1300, 1306 (9th Cir.1981). Here, this conclusion would appear to be even more apt because the Clause 8 at issue was amended to specifically set the responsibilities of the charterer and the ship's owner. Clause 8 of the agreement between BSC and Roscoe Shipping places responsibility for proper stowage and delivery of cargo on the ship's owner. *See Irby, supra,* (addressing same alteration in Clause 8 language and finding no responsibility for discharge on time charterer). Discharge of cargo is not "under the supervision of the captain." As the Eleventh Circuit stressed in *Spence,* "[t]he plain language of the [clause] contains no ... suggestion [that the charterer has a duty to supervise.] * * * [It] makes no mention of the longshoremen's safety, and the plaintiff has not presented any extrinsic proof that the parties (BSC and Roscoe Shipping) meant to impose such a duty." *Spence,* 766 F.2d at 1507. *See Mallard v. Aluminum Co. of Canada, Ltd.,* 634 F.2d 236, 242 n. 5 (5th Cir.1981) (pre-*Scindia* case to same effect). Thus, we reject appellant's argument that Clause 8 represents BSC's agreement with Roscoe Shipping to undertake responsibility for the safety of longshoremen during cargo operations.

The only remaining avenue that appellant argues in favor of reversal under *Scindia* is that BSC's contract with Ceres gave BSC such control of the stevedoring operations on the Ravenna as to raise a duty on BSC's behalf to ensure the safety of Ceres employees. She points to the provisions in the agreement between Ceres and BSC granting BSC's representative the right to be present during stevedoring operations; the representative's right to make recommendations to the Captain if he noticed improper stevedoring practices; and the ten pages of BSC instructions to Ceres regarding proper handling of BSC cargo.

Contrary to appellant's assertions, the contractual provisions that she argues gave BSC operative control of stevedoring operations, in fact, merely determine and regulate the proper handling of BSC cargo so as to avoid damage to it. For example, provision 3.5 of the Memorandum of Agreement states that "[Ceres is] to ensure all handling of steel products are carried out in accordance with B.S.C.'s 'Instructions to stevedores' ... *If persistent negligent handling and/or damage to cargo attributable to contractor or their employees should occur as a result of failing to follow or comply with said instructions,* B.S.C. shall have the right to immediately terminate this agreement." (emphasis added). Likewise, paragraph 3.9 of the same document merely states that Ceres is "to liaise closely with B.S.C. shipping agent on all aspects of vessel's work program and to fully cooperate in the provision of relevant information thereto." This provision contains no language that would indicate that BSC was trying to control the "work program." Rather, paragraph 3.9 simply ensures that BSC will know what that work plan is. In Supplementary Agreement No. 3, paragraph 1, plaintiff cites certain language out of context, to imply that BSC had power to stop work in the event of stevedoring malpractice. Indeed, the title of Supplementary Agreement No. 3 is "[Agreement] in respect of Handling Products Originating From United Engineering Steels and Allied Steel and Wire." The full text of paragraph 1 is as follows:

> The stevedores are to remain fully responsible *for all damage incurred as a result of their fault during discharge/handling operations.* Full details are to be recorded at the time of occurrence. BSC cargo superintendent is empowered to cease operations in the event of stevedoring malpractice.

(emphasis added). As with the other provisions relied on by appellant, no reasonable

inference can be gleaned from paragraph 1 that this provision concerns the undertaking of an affirmative duty by BSC to supervise or ensure the safety of longshoremen. It concerns, explicitly, the safety of BSC's cargo. Finally, the ten pages of instructions to Ceres, concerning which appellant poses the question, "how much more control could BSC exercise," are entitled "Instructions to Stevedores Loading/Discharging BSC Steel Products." They are a laundry list of instructions which could only be described as suggestions on how to handle the various different products that BSC ships.

As we explained with regard to Clause 8 of the time charter agreement, there is no plain language in any of the agreements between BSC and Ceres which would indicate that BSC undertook to either control the manner in which Ceres employees did their work or to supervise or ensure the safety of Ceres employees beyond the duty established by the Supreme Court in *Scindia.* Furthermore, even assuming Restatement (Second) Torts § 414 applies to LHWCA cases, BSC did not exercise the type of control described in Comment (c). ("It is not enough that the employer has merely a general right to order work stopped or resumed, to inspect its progress, receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work or as to operative detail."). *See Hurst v. Triad Shipping Co.,* 554 F.2d 1237 (3rd Cir.1977) (addressing similar deficiency of control exercised by vessel to impose liability under the Restatement). Finally, to the extent that the depositions in this case are at all relevant in determining the intent of the parties to the contract, *see Spence,* 766 F.2d at 1507 (allowing parties to bring extrinsic evidence to show parties intent as to duty to supervise), both Tore Sorenson and John Folan denied that BSC was involved in any way in the operative control of stevedoring on the Ravenna or that BSC had any authority to control the manner in which Ceres conducted its work. Indeed, Sorenson testified that Folan had no authority to tell him how to do his job and that the responsibility to ensure the safety of his workers was his own.

Because, under *Scindia,* BSC has no general duty to supervise stevedoring operations and because BSC's contractual arrangements did not impose a duty upon it, there is no evidence which could support a jury verdict in plaintiff's favor. Therefore, we AFFIRM the judgment of the district court granting summary judgment in favor of defendant-appellee, BSC.