**Johnnie LENOIR, Plaintiff,**

v.

**ROLL COATER, INC., Defendant.**

**No. S91–14M.**

United States District Court,
N.D. Indiana,
South Bend Division.

April 13, 1992.

Rick C. Gikas, Merrillville, IN, for plaintiff.

Gerald F. Lutkus, South Bend, IN, Ronald R. Snyder, Lester H. Cohen, Indianapolis, IN, for defendant.

## MEMORANDUM AND ORDER

MILLER, District Judge.

Plaintiff Johnnie Lenoir brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–1 *et seq.*, alleging that Roll Coater, Inc. ("Roll Coater") discharged her on the basis of her race and created or permitted a racially hostile environment. Roll Coater moves for summary judgment, claiming that Ms. Lenoir cannot produce legally sufficient evidence to raise a genuine issue of fact as to either claim. In addition, Ms. Lenoir has moved to unseal and publish the depositions taken in this case, and has moved for leave to file an amended complaint. The motion to amend was stayed pending this order.

### I. Motion to Publish Depositions

Roll Coater opposes Ms. Lenoir's motion to publish the depositions, noting that Ms. Lenoir has not complied with District Rule 15(c), which states that if depositions are to be used in connection with a pretrial motion that might result in a final order on any issue, the portions of the depositions to be used should be filed. Ms. Lenoir did not attach the portions of the depositions upon which she relies in opposing summary judgment, but referred to specific portions of the depositions in her memorandum. The full depositions are on file with the court. Roll Coater is correct that Ms. Lenoir should have attached deposition excerpts rather

than relying on the originals; nonetheless, in the interests of time and justice, rather than require Ms. Lenoir to submit portions of the deposition testimony upon which she relies, the court will grant the motion to publish and consider the pages in the depositions upon which Ms. Lenoir relies.

## II. Summary Judgment

 Roll Coater must demonstrate that no genuine issue of fact exists for trial and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cusson–Cobb v. O'Lessker*, 953 F.2d 1079, 1080 (7th Cir.1992). If that showing is made, Ms. Lenoir must come forth with evidence to show what facts are in actual dispute. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Sims v. Mulcahy*, 902 F.2d 524, 540 (7th Cir.), *cert. denied*, 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990). Summary judgment is proper if she fails to do so. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990); *Tatalovich v. City of Superior*, 904 F.2d 1135, 1142 (7th Cir.1990). A genuine factual issue exists only if sufficient evidence exists to support a verdict for Ms. Lenoir. *Harbor House Condominium Ass'n v. Massachusetts Bay Ins. Co.*, 915 F.2d 316, 320 (7th Cir.1990); *Hines v. British Steel Corp.*, 907 F.2d 726, 728 (7th Cir. 1990). Summary judgment should be granted if no reasonable factfinder could return a decision for Ms. Lenoir. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir.1991); *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 660 (7th Cir.1991).

The parties cannot rest on mere allegations in the pleadings, *Hughes v. Joliet Correctional Center*, 931 F.2d 425, 428 (7th Cir. 1991); *McCarthy v. Kemper Life Ins. Companies*, 924 F.2d 683, 687 (7th Cir.1991), or upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker*, 953 F.2d at 1081; *Mestayer v. Wisconsin Physicians Service Ins. Corp.*, 905 F.2d 1077, 1079 (7th Cir. 1990). The court must construe the facts as favorably to Ms. Lenoir as the record will permit, *Brennan v. Daley*, 929 F.2d 346, 348 (7th Cir.1991); *Soldal v. County of Cook*, 923 F.2d 1241, 1245 (7th Cir.1991), and draw any permissible inferences from the materials before it in her favor, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), as long as the inferences are reasonable. *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). Ms. Lenoir must show that the disputed fact is material, or outcome-determinative, under applicable law. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir.1989).

 Even on an issue of intent, summary judgment is proper if Ms. Lenoir presents no indication of the necessary motive or intent. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307 (7th Cir.1989).

 Although the conflicting evidence must be probative and more than merely colorable, *Renovitch v. Kaufman*, 905 F.2d 1040, 1044 (7th Cir.1990), the court may not resolve credibility issues at the summary judgment stage.

### A.

Ms. Lenoir was a salaried employee at Roll Coater's facility in Kingsbury, Indiana from August 6, 1978 to March 17, 1989. In 1989, the Kingsbury plant manager was James Barrett; Doug Jesch was the personnel manager. Mr. Barrett reported directly to Don Ebert, the Vice President of Operations. Mr. Jesch reported directly to Dennis Mullins, the personnel director for the Roll Coater facilities in Kingsbury and in Greenfield, Indiana.

Ms. Lenoir first worked as a data entry clerk; she became a shipping clerk in 1985, a position she held until her discharge. From August 1988 until her discharge, Ms. Lenoir worked the first shift, from midnight until 8:00 a.m. Ms. Lenoir was on medical leave shortly before her discharge, and was under the care of a psychiatrist, Dr. Sajja Babu. Dr. Babu released Ms. Lenoir for work on March 8, 1989, and she returned to work on March 13.

The parties present conflicting versions of the events leading up to Ms. Lenoir's dis-

charge. Roll Coater claims that at 4:00 a.m. on March 15, Ms. Lenoir and co-workers Mary Russell and Arthur Newkirk were on break in the shipping office when Ms. Lenoir displayed a large knife and told the others she could kill them without remorse. Mr. Newkirk described this incident in his deposition and in a statement to Mr. Jesch and Mr. Barrett shortly after the incident. Ms. Russell also testified that:

> [Johnnie Lenoir] got a knife out of her purse, and she said, "I can kill you, you, and you and not think nothing about it." And I replied back to her, "Johnnie, I couldn't do something like that." And then about that time Art turned around, looked at it and asked her if he could see the knife; and she handed it to Art. Art had it in his hand and was looking at it; I never touched it. He said that his son had one like that, then he handed it back to her; and she put it back away and went on about her business. . . .

> [She took out the knife again] later on in the shift, and Wendy [Boyd] come in there and Wendy was telling her about . . . a mishap that happened on—that she might get asked . . . about, and she got the knife out, pointed it; she said, "I'll handle that with this." And Wendy said something like, "Johnnie, put that away or whatever," and Johnnie put it away.

Russell Dep., pp. 7–8. Ms. Russell testified that she feared Ms. Lenoir. Ms. Russell reported the incident to her night shift supervisor, Roger Freeman; Mr. Newkirk reported it to his supervisor, Tom King.

After Mr. Barrett arrived at 7:00 a.m., Mr. King and Mr. Freeman told him what they had been told. Mr. Barrett summoned Ms. Russell to his office, and she again explained what had happened and told Mr. Barrett that she felt intimidated and afraid to go to work. Mr. Barrett took notes during the meeting with Ms. Russell and later dictated them to his secretary.

At 9:00 a.m., Mr. Barrett discussed the incident with Mr. Jesch, who telephoned Mr. Mullins in Greenfield. Mr. Jesch considered the incident a "major violation of company rules", which prohibit possession of weapons on company property. During the next several hours, Mr. Jesch interviewed Ms. Russell, Ms. Boyd, and another employee, Vicki Green. Mr. Jesch, Mr. Mullins, and Mr. Barrett decided to suspend Ms. Lenoir pending further investigation, and Mr. Jesch informed Ms. Lenoir of this decision by telephone. Mr. Jesch and Mr. Barrett continued their investigation with interviews of Ms. Russell and Ms. Green. Ms. Green, who had trained Ms. Lenoir as a shipping clerk, reported that Ms. Lenoir had told her she had a knife in her purse and a gun in her truck and that her psychiatrist had said she was capable of murder. Ms. Green further stated that Ms. Lenoir tried to intimidate her and said, "Do not cross me."

On March 16, Mr. Mullins spoke with Ms. Lenoir by telephone for about twenty minutes. Ms. Lenoir denied having a large hunting knife, but stated that she had a pocket knife. She also said that another employee, Tom Dove, had a large hunting knife like the one described, and that supervisor Jim Keller knew about it. Mr. Keller denied this. After further discussions with Mr. Jesch and Mr. Barrett, Mr. Mullins telephoned Ms. Lenoir and left a message on her answering machine that she was terminated. He followed this message with a formal letter of termination on March 17.

Ms. Lenoir recalls the events differently. She states that during her early years at Roll Coater, racial harassment was not permitted and she experienced no problems with discrimination. As time progressed, however, the atmosphere deteriorated. Some supervisors, particularly Mr. Barrett and foremen Jim Keller and Jim DiFilippo, and some co-workers used and tolerated racial slurs and comments. In one supervisors' meeting in which an employee was being discussed, Mr. Barrett turned to another supervisor and asked, "Why didn't you check her out better? You know all black women are double trouble." Janet Seib, a black female, was among the supervisors present at the meeting.

Mr. Keller would treat Ms. Lenoir more harshly than her white co-workers, but Ms. Lenoir's complaints to Mr. Barrett and Mr. Jesch about this situation were to no avail. Ms. Lenoir showed Ms. Seib a memo on which someone had written "nigger bitch",

and Ms. Seib removed the memo and took it to her supervisor. Ms. Seib stated that a supervisor called one black employee "Sambo" over the public address system. Ms. Lenoir reports that there were several incidents of a black employee being called "Sambo" or "Shadow" over the public address system during the midnight shift. One supervisor called Ms. Seib "Buckwheat" in a telephone conversation, but apologized after Ms. Seib expressed her disapproval of this remark. When one employee told another "just do as the niggers do," the speaker was disciplined.

Roll Coater claims that some of the instances of racial misconduct occurred after Ms. Lenoir was terminated, and it claims that each of these instances resulted in disciplinary action of some kind. The supervisor who used a racial epithet in the office was warned against using racial slurs, and the warning went into his personnel file.

Ms. Lenoir claims that Mr. DiFilippo, who supervised her in 1985, made a racist and sexist remark, but she acknowledges that she complained to the plant superintendent and that Mr. DiFilippo was reprimanded.

Two incidents of racial slurs by hourly employees resulted in reprimands by supervisors. One incident occurred in August 1989, after Ms. Lenoir's termination.

Vicki Green trained Ms. Lenoir in the shipping office. Ms. Lenoir claims that Ms. Green referred to her as a "dumb nigger", and that when Ms. Lenoir complained to her supervisors of the improper training she was receiving, the situation was not corrected. However, Ms. Lenoir testified in her deposition that when she mentioned her dissatisfaction with her training, a supervisor told her that the company would not let her be trained improperly.

Ms. Lenoir claims that Mr. Barrett, the Kingsbury plant's second highest official, was "perhaps the worst offender" in creating a hostile environment. She claims that she was terrified of going into Mr. Barrett's office because he tried to molest her and that he showed her a picture of a "half naked" black woman. Ms. Lenoir believes that Mr. Barrett would not have treated her this way if she were white. Ms. Lenoir claims that this situation lasted from Mr. Barrett's arrival at the plant in 1983 until her termination, but she, as a single mother, felt compelled to tolerate this treatment to remain employed.

Ms. Lenoir claims that while she was working in the shipping office at 4:00 a.m. on March 15, 1989, Mr. Newkirk and Ms. Russell entered the office. Mr. Newkirk asked if another employee was still dating someone, and Ms. Russell replied, "Yeah, she still goes with that nigger." Ms. Lenoir asked if she (Ms. Lenoir) ever spoke of "honkies" or "crackers," and Ms. Russell told Ms. Lenoir, "I wasn't talking about you." Ms. Lenoir did not discuss the matter further, and finished her shift at 8:00. Ms. Lenoir contends that Mr. Newkirk and Mr. Russell spread a rumor about her brandishing a knife because they were upset about being called to account for their racist conversation.

Mr. Dale Wakeman testified that he was in the shipping office briefly at the same time as Ms. Lenoir, Ms. Russell, and Mr. Newkirk on March 15, that he did not see a knife, and that Mr. Newkirk and Ms. Russell did not seem upset. Ms. Boyd testified that Ms. Lenoir had never shown her a knife, and that she told her supervisors that no such incident had occurred. She had never seen or signed any statements regarding this incident. Ms. Boyd also testified that Ms. Lenoir had never threatened or intimidated her in any way, and called the accusation that Ms. Lenoir brandished a knife "an outright lie".

Ms. Lenoir notes that although Roll Coater claims its supervisors were informed of and began investigating the knife incident as early as 7:30 a.m., Ms. Lenoir was not questioned about it before she left work at 8:30 a.m. No one called security or the police. She also notes a discrepancy between Mr. Barrett's testimony and Ms. Russell's testimony: Ms. Russell claims that she did not discuss the knife incident with Mr. Jesch or Mr. Barrett until she was asked to meet with them at about noon; Mr. Barrett claims that Ms. Russell was asked to come to his office at about 7:30 a.m., before Ms. Russell left work. Mr. Jesch made notes of his conversations with Ms. Boyd and Mr. Wakeman about

the knife incidents, noting that these employees had not seen Ms. Lenoir holding a knife.

#### B.

Roll Coater proffers two reasons to grant summary judgment on the racially hostile environment claim: the allegations fail to support a claim, and most of the acts of harassment are alleged to have occurred more than 300 days before Ms. Lenoir filed her EEOC charge.

To state a claim of hostile environment, Ms. Lenoir must show that the racial epithets spoken at Roll Coater were severe or pervasive enough to alter the conditions of employment and create an abusive working environment. *Brooms v. Regal Tube Co.*, 881 F.2d 412, 418 (7th Cir.1989); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). The test employed in this circuit involves both a subjective component and an objective component: the court must consider both the effect of the harassment on the employee and the evolving judicial consensus as to the constitutive elements of cognizable harassment in a hostile work environment. *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271–1272 (7th Cir.1991).

Roll Coater claims that some of Ms. Lenoir's allegations of racial harassment are general and conclusory. Her deposition refers to her "overall opinion" that her supervisors were racist and her feeling that Mr. Barrett would have treated her differently had she been white. She also voiced her opinion that she was reprimanded harshly for mistakes she made, but her white co-workers' mistakes went without reprimand. In *Nazaire v. Trans World Airlines, Inc.*, 807 F.2d 1372, 1381 (7th Cir.1986), the court found that vague allegations of discrimination without exact dates and without support in the evidence were too nebulous to raise a genuine issue of fact as to actionable racial harassment. The court agrees that Ms. Lenoir cannot base a harassment claim on general, conclusory allegations. The court must focus on the specific instances of racial harassment that Ms. Lenoir alleges.

Roll Coater contends that the racial slurs by Roll Coater personnel were too sporadic to create a hostile work environment. In *North v. Madison Area Ass'n for Retarded Citizens*, 844 F.2d 401, 409 (7th Cir.1988), the plaintiff identified only two or three comments that might be considered racial slurs over a ten year period to support his claim of a racially hostile environment. The Circuit Court stated that "occasional or sporadic uses of racial slurs or epithets will not in and of themselves support an actionable claim of racial harassment.... Whether the quantity and frequency of such incidents sufficiently constitute a violation of Title VII ... is determined by reviewing the totality of the circumstances on a case by case basis."

Unlike the plaintiff in *North*, Ms. Lenoir points to several unmistakable epithets which brought complaints from other employees and from one supervisor as well as from Ms. Lenoir. Moreover, many of the derogatory comments were made by supervisory personnel. As the Seventh Circuit stated in *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1421 (7th Cir.1986):

> Not only is it hard to see how an isolated racial slur could be thought a significant enough event to count as employment discrimination; it is unclear what practical steps an employer could take to purge all racially offensive speech from the workplace. An employer "is not charged by law with discharging all Archie Bunkers in its employ". *Howard v. National Cash Register Co.*, 388 F.Supp. 603, 606 (S.D.Ohio 1975). That would be an unrealistic burden.

> But failure to take reasonable steps to prevent a barrage of racist acts, epithets, and threats can make an employer liable if management-level employees knew, or in the exercise of reasonable care should have known, about the campaign of harassment.

*See also Daniels v. Essex Group, Inc.*, 740 F.Supp. 553, 559 (N.D.Ind.1990), *aff'd*, 937 F.2d 1264 (7th Cir.1991) ("An employer may violate Title VII by creating or condoning an environment at the workplace which significantly and adversely affects the employee's well-being on the basis of race.").

Roll Coater claims that Mr. Barrett's remark that black women are "double trouble" is outweighed by his action of recommending additional training for the employee he was discussing. A reasonable trier of fact could find, however, that in addition to making his own derogatory comments, Mr. Barrett generally tolerated the use of racial slurs by other supervisors and employees.

Ms. Seib's testimony shows that some supervisory personnel thought little of making racial remarks in front of her, a black supervisor, and in front of other black employees. Some remarks were directed toward black employees. When she directed one employee to stop calling a black worker "Sambo" over the loud speaker, he protested that he had always been allowed to do it. Ms. Seib testified that she believes the remark still is being made in her absence.

Because management-level employees heard and made use of racial epithets, Roll Coater cannot genuinely claim that it did not know of this kind of abusive behavior.

■ The court does not wish to be viewed as condoning the racial epithets used at Roll Coater. They are base and offensive. Nonetheless, no reasonable trier of fact could find that they rise to the level of a Title VII violation.

In *Daniels v. Essex Group,* 937 F.2d at 1274, the court set forth several factors courts may consider in assessing the objective component of a hostile work environment claim. One of those factors—the plaintiff's reasonable expectations upon voluntarily entering the work environment—favors Ms. Lenoir's claim. Evidence in the record indicates that racial epithets were rare at Roll Coater in the early years of Ms. Lenoir's employment; under these circumstances, as well under contemporary standards of decency, any black American reasonably could expect a work environment relatively free of racial slurs and epithets.

Every remaining consideration, however, favors Roll Coater. The severity of the remarks was insufficient to create a hostile work environment. *Minority Police Officers v. City of South Bend,* 617 F.Supp. 1330, 1352–1353 (N.D.Ind.1985), and the cases cited therein, state that offensive racial epithets do not rise to the level of a Title VII violation unless the working environment is dominated by racial slurs.

[T]he derogatory comments must be excessive and at an opprobrious level, so as to alter the conditions of employment and create an abusive working environment.... However, neither racial comments that are merely part of casual conversation, nor infrequent, sporadic, accidental racial comments or epithets even if they engender offensive feelings in an employee, rise to the level of a Title VII violation—more than a few isolated incidents of racial harassment must have occurred to prove a claim under Title VII based on working conditions.... Thus, a court is dealing with degrees in determining whether a plaintiff has proven that the racially derogatory comments have created a psychologically damaging environment.

*Minority Police Officers v. City of South Bend,* 617 F.Supp. at 1353 (citations omitted). The slurs and epithets contained no element of threat, as was found in *Daniels v. Essex Group, Inc.,* 937 F.2d 1264.

Further, although Ms. Lenoir pointed to several instances of racially derogatory comments, they were spread out over several years. Most of the racial slurs alleged do not appear to have been directed toward Ms. Lenoir. The court in *Minority Police Officers v. City of South Bend,* 617 F.Supp. at 1355, found this factor significant. Further, as noted above, Roll Coater presented evidence that it refused to tolerate racist remarks, and it disciplined its employees for such actions.

■ Roll Coater claims that most of Ms. Lenoir's allegations of racial harassment are time-barred. A charge of discrimination under Title VII must be filed with the EEOC within 300 days of the unlawful employment practice. 42 U.S.C. § 2000e–5(e). *Delaware State College v. Ricks,* 449 U.S. 250, 256, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980). The 300–day period begins to run when the unlawful practice occurs, not when the plaintiff feels the effects of the practice. *Delaware State College v. Ricks,* 449 U.S. at 258, 101 S.Ct. at 504.

Roll Coater claims that because Ms. Lenoir filed her EEOC charge on May 30, 1989, she cannot maintain an action for any conduct that occurred before August 3, 1988. Roll Coater asserts that only one incident, which occurred on or about March 15, 1989 may support a hostile work environment claim: Ms. Russell's reference to a "nigger" in the shipping office. Roll Coater claims this incident is insufficient as a matter of law to constitute racial harassment. Ms. Russell testified that when she reported the conversation in the shipping office to Mr. Jesch, he told her, "We don't say that."

In response to the assertion that many of the racial harassment claims are untimely, Ms. Lenoir cites *Leffingwell v. Sears, Roebuck & Co.,* 717 F.Supp. 620 (N.D.Ill.1989) ("[E]vidence regarding allegedly discriminatory acts occurring outside the limitations period may be admissible in suits predicated on discrimination within the limitations period."); and *Minority Police Officers v. City of South Bend,* 617 F.Supp. at 1333 ("[A]lthough earlier actions of the defendants are admissible, any such actions may not form a basis for relief in this case.").

Ms. Lenoir also states that to the extent that the discriminatory acts are continuing in nature, evidence of those acts is independently admissible as substantive claims under the continuing violation theory set forth in *Leffingwell v. Sears,* 717 F.Supp. at 623, and *Torres v. Wisconsin Dept. of Health and Social Services,* 838 F.2d 944 (7th Cir.1988). In *Leffingwell,* 717 F.Supp. at 623, the court explained that in order to fall within the continuing violation doctrine, there must be some continuing discriminatory acts, not merely results, which occur within the limitations period. Ms. Lenoir does not elaborate on how her harassment claims fall within this doctrine.

In *Torres v. Wisconsin Dept. of Health and Social Services,* 838 F.2d at 948, the court applied the continuing violation doctrine because the employer had announced a discriminatory policy, but the policy affected the plaintiffs later when they were demoted pursuant to the policy.

This circuit has described a continuing violation as one "in which the employer's ex-

press, openly espoused policy [is] alleged to be discriminatory" and "was applicable to the plaintiff at the time the discrimination charge was filed." *Stewart v. CPC Int'l, Inc.,* 679 F.2d 117, 121 (7th Cir. 1982).... This case does not involve merely a one-time act of demoting [the plaintiffs]. Rather, [the] openly discriminatory policy remained in effect subsequent to the demotions and continued to exclude all male correctional officers, including the plaintiffs, from the positions covered by the Plan.

*Torres v. Wisconsin Dept. of Health and Social Services,* 838 F.2d at 948, n. 3 (citation omitted).

■■■ In this case, the hostile work environment claims are based on racial slurs spoken in the workplace. Ms. Lenoir does not show that an official policy of promoting or tolerating these slurs existed and continued to affect her during the limitations period. As noted above, many of the racial comments demonstrated were not directed toward her, and she does not show that many of these comments were made in her presence. She also does not dispute Roll Coater's claim that many of the specific instances of discriminatory treatment occurred outside the limitations period. Accordingly, the court concludes that while the slurs are evidence that may be considered in determining whether race was a determining factor in her discharge, summary judgment on the hostile work environment claim should be granted in favor of Roll Coater.

### C.

■■■ A plaintiff may seek to prove employment discrimination in either of two methods: she may present direct or circumstantial evidence that her race was a determining factor in her discharge, or she may proceed under the now-familiar indirect, burden-shifting method of proof. *Karazanos v. Navistart Int'l Transportation Corp.,* 948 F.2d 332, 335 (7th Cir.1991). No evidence in this record would support the former approach; Ms. Lenoir must proceed under the indirect method of proof.

### 1.

Ms. Lenoir bears the initial burden of establishing a *prima facie* case of discrimination. Roll Coater analyzes Ms. Lenoir's claims under the standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. To meet her burden under this standard, Ms. Lenoir must show by a preponderance of the evidence that:

(a) she is a member of a protected group;

(b) she was performing her work according to Roll Coater's legitimate business expectations;

(c) despite her performance, she was terminated; and

(d) similarly situated employees who were not in a protected group were treated more favorably.

*Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 923 (7th Cir.1988).

If Ms. Lenoir establishes a *prima facie* case, the burden shifts to Roll Coater to articulate a legitimate, nondiscriminatory reason for its decision to terminate Ms. Lenoir. If Roll Coater does so, the burden shifts back to Ms. Lenoir to demonstrate that the articulated reason is a mere pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824; *William v. Williams Electronics*, 856 F.2d at 923. To meet this burden, Ms. Lenoir may demonstrate that it is more likely that Roll Coater was motivated by a discriminatory reason than by its proffered reason or that the proffered reason is incredible. *Oxman v. WLS–TV*, 846 F.2d 448, 456 (7th Cir.1988).

Roll Coater notes that the question before the court is not whether Ms. Lenoir wielded a knife on Roll Coater property, the question is whether Roll Coater terminated her in the belief that she did so, or, in fact, terminated her because of her race. Roll Coater claims that Ms. Lenoir presents no evidence that Mr. Jesch, Mr. Barrett, and Mr. Mullins did not believe in good faith, based on a substantial investigation, that the violation occurred.

Ms. Lenoir claims that Roll Coater cannot rely on the investigation it conducted before terminating Ms. Lenoir because the investigation itself was racially biased. She also claims that the hostile work environment at Roll Coater is evidence that she was discharged for a racially discriminatory reason.

### 2.

The parties agree that Ms. Lenoir establishes the first three elements of a *prima facie* case of discriminatory discharge. Roll Coater claims she fails to demonstrate the fourth element, that she was treated more harshly than similarly situated white coworkers. Roll Coater claims that it discharged no other employees for violating the policy against possessing weapons on company property, because no other employee had violated this policy. Ms. Lenoir claims that the policy had been routinely violated.

Roll Coater's letter terminating Ms. Lenoir gave two reasons for the termination:

As a result of our investigation regarding your alleged behavior on Tuesday, March 14 and Wednesday, March 15, 1989, your employment with Roll Coater, Inc. is terminated as of this date, March 17, 1989.

The basis for your termination is violation of Company rules as follows:

—Possession of firearms, weapons, or explosives of any kind on Company property.

—Coercing, intimidating, threatening or interfering with other employees or supervision.

Ms. Lenoir has not demonstrated that other employees intimidated co-workers. Therefore, even if Ms. Lenoir can demonstrate that other employees violated the rule against having weapons on company property, she cannot show that similarly situated white employees were treated more favorably. She has not shown that other employees violated both the rule against possession of weapons and the rule against intimidation, or that other employees were treated more favorably after having committed these two violations. Ms. Lenoir has, however, presented evidence that other employees possessed knives on company property without

being discharged. Her termination notice does not indicate that violating only one policy would be insufficient reason to terminate her. Therefore, she claims that she was treated less favorably than other employees who violated a single rule.

Roll Coater claims that although other employees may have had knives on company property, there is no showing that other employees possessed weapons. Mr. Newkirk, Ms. Seib, and Mr. Wakeman testified that they had not seen others carrying a large knife like the one Ms. Lenoir was accused of possessing on company property. Nonetheless, Ms. Lenoir stated that another employee, Tom Dove, had a large hunting knife like the one described as being in her possession, and that supervisor Jim Keller knew about it. Roll Coater has pointed to no dissimilarities between Mr. Dove and Ms. Lenoir; Roll Coater simply denies that any other employee violated the "no weapons on premises" rule. *Compare Timms v. Frank,* 953 F.2d 281, 286–287 (7th Cir.1992). That denial does not foreclose summary judgment; it simply frames the genuine dispute of material fact. The court deems this evidence sufficient, for summary judgment purposes, to establish a *prima facie* case.

### 3.

Roll Coater asserts that even if Ms. Lenoir establishes a *prima facie* case, it has articulated a legitimate, nondiscriminatory reason for discharging her. The court agrees that the reason proffered for Ms. Lenoir's discharge is legitimate. Therefore, Ms. Lenoir bears the burden of showing that Roll Coater's reason is mere pretext.

Ms. Lenoir cannot prove pretext merely by denying that the knife incident happened; she must disprove Roll Coater's specific explanations for its decision to terminate her. *Aungst v. Westinghouse Electric Corp.,* 937 F.2d 1216, 1220 (7th Cir.1991); *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir.1988) ("We do not sit as a super-personnel department that reexamines an entity's business decisions.... Rather, our inquiry is limited to 'whether the employer gave an honest explanation of its behavior.' ").

In *North v. Madison Area Ass'n for Retarded Citizens,* 844 F.2d 401 (7th Cir.1988), which Roll Coater cites, the plaintiff failed to establish an actionable claim of discriminatory discharge because the evidence showed that the plaintiff would have been terminated regardless of his race, due to a decline in funding.

In *Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 558 (7th Cir.1987), the plaintiff brought a disparate treatment claim arising out of his discharge for violating the company policy on absences. The Circuit Court stated that "no federal rule requires just cause for discharges," citing *NLRB v. Loy Food Stores, Inc.,* 697 F.2d 798, 801 (7th Cir.1983), and concluded that the judgment in the plaintiff's favor must be reversed because "the district court confused mistake with 'pretext' ". *Pollard v. Rea Magnet Wire Co.,* 824 F.2d at 559. The district court had found that two white employees had been fired for missing work and lying about their absences, which the plaintiff had not done. However, the district court found that the employer believed that the plaintiff had lied. The circuit court concluded:

> In the end, the district judge believed that Rea was not well run ... and ... erred in not believing Pollard's excuse. An arbitrator who came to these conclusions could order Pollard reinstated with back pay. A district judge does not sit in a court of industrial relations. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII [does] not interfere.... Unless Pollard's race mattered—unless he would have been kept on if he were white—he is not entitled to relief.... The employee must show that race is the dispositive factor.

*Pollard v. Rea Magnet Wire Co.,* 824 F.2d at 560–61. Roll Coater claims that its honestly held belief that Ms. Lenoir violated company rules is not a pretext for discrimination, even if Roll Coater was mistaken.

The recent cases of *Giacoletto v. Amax Zinc Co., Inc.,* 954 F.2d 424 (7th Cir.1992), and *Perfetti v. First National Bank of Chicago,* 950 F.2d 449 (7th Cir.1991), explain that a

plaintiff may prove employment discrimination with any of four different types of evidence. First, she may present direct evidence, such as discriminatory statements uttered by the decision-maker, that her race was a determining factor. Second, she may present circumstantial evidence, such as statistical imbalance in the employer's workforce, that her race was a determining factor. Third, she may present direct evidence that her employer's proffered reasons were pretextual; such evidence would include a contradiction between the reasons stated in court and reasons stated in earlier documents, or a contradiction between the witnesses as to the discharge. Fourth, she may present circumstantial evidence of pretext, · such as evidence that the proffered justification has been inconsistently applied to other employees. *Giacoletto,* 954 F.2d at 425–426; *Perfetti,* 950 F.2d at 450–451. Ms. Lenoir proceeds with a combination of the first, third, and fourth methods.

Ms. Lenoir claims that the investigation itself was racially skewed. It appears as though the evidence was conflicting as to whether Ms. Lenoir violated the rules, but the employees who claimed they saw no knife were not constantly in the area where Ms. Lenoir was said to have had the knife. Although Ms. Lenoir shows that the investigation could have been more thorough, and less onesided, she does not show that the investigators could not have come to the good faith belief that she violated company rules. The investigation, though not perfect, led to the conclusion that Ms. Lenoir violated the rules. *See Aungst v. Westinghouse Electric Corp.,* 937 F.2d at 1220 ("We must give the employer the benefit of the doubt regarding its explanation of employment decisions."). *See also Grohs v. Gold Bond Building Products,* 859 F.2d 1283, 1288 (7th Cir.1988).

Ms. Lenoir has shown that Mr. Barrett, who had authority to fire her, used racial slurs. In light of the evidence of Mr. Barrett's pre-termination harassment of Ms. Lenoir, the court cannot say that Mr. Barrett's post-termination comments could not be probative of his intent on March 16. *Cf. Tennes v. Commonwealth of Massachusetts, Dept. of Revenue,* 944 F.2d 372, 378 (7th Cir.1991).

Therefore, his involvement in the investigation of the knife incident is suspect. Statements by inferiors are not probative of the decisionmaker's intent to discriminate, *Aungst v. Westinghouse Electric Corp.,* 937 F.2d at 1221, but this rule applies only if the so-called inferior was not also a decisionmaker. *Perfetti v. First National Bank of Chicago,* 950 F.2d 449, 453 n. 5 (7th Cir. 1991). However, Ms. Lenoir testified that Mr. Mullins, who was also involved in the investigation, had treated her fairly in the past. Ms. Lenoir has not shown that Mr. Mullins or Mr. Jesch tolerated racial slurs.

Ms. Lenoir has not shown that the explanation for her discharge is unworthy of credence or that it is more likely that Roll Coater was motivated by racial discrimination than by its need to enforce company rules when it discharged Ms. Lenoir. Viewing the record most favorably to her, she has established that Roll Coater's investigation may have led it to an incorrect factual determination, but she has not presented anything from which a trier of fact could find that her race played a part in the decision. The evidence indicates that Ms. Lenoir would have been discharged for violating the rules regardless of her race. Therefore, the court concludes that summary judgment should be entered as to the claim of discriminatory discharge.

### III.

Ms. Lenoir also moved to amend her complaint pursuant to the Civil Rights Act of 1991 to assert a claim for punitive damages under 42 U.S.C. § 1981 due to her discharge. Because the same standards would govern the plaintiff's § 1981 claim as govern her Title VII claim, the amendment would not affect her ability to demonstrate that her race was a determining factor in her discharge, the court need not address the motion to amend.

For the foregoing reasons, the court hereby:

(1) GRANTS the plaintiff's motion to publish depositions;

(2) GRANTS the defendant's motion for summary judgment; and

(3) DENIES as moot the previously stayed motion by the plaintiff to amend the complaint.

Further, the court hereby VACATES the previously established scheduling deadlines, the final pretrial conference scheduled for May 4, 1992, and the trial scheduled for May 11, 1992.

SO ORDERED.