## In the
# United States Court of Appeals
### For the Seventh Circuit

---

No. 01-1939

VALERIE BENNETT,

*Plaintiff-Appellant,*

v.

MARY ROBERTS, MARSHAL ASPINALL,
TIMOTHY COSTELLO, et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 6917—**John W. Darrah**, *Judge.*

---

ARGUED NOVEMBER 15, 2001—DECIDED JULY 2, 2002

---

Before BAUER, POSNER and RIPPLE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Valerie Bennett filed this action against the seven members[1] of the Board of Education of Naperville Community Unit School District 203, in their individual and official capacities ("the Board"). She alleged that the school district had engaged in racially discriminatory hiring practices. The district court entered summary

---

[1] The members include: Mary Roberts, Marshal Aspinall, Timothy Costello, Livia McCammon, O.C. Davenport, Brian Barnes and Rudy Carl.

judgment for the Board on the ground that Ms. Bennett had failed to prove her allegations. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

In the fall of 1994, Ms. Bennett, an African-American, sought employment as a teacher with Naperville Community Unit School District 203 ("the School District"). Comprised of twenty-one grade, junior high and high schools, the School District serves the community of Naperville, Illinois[2]—a far western suburb of the city of Chicago.

Because it is well-regarded among educators, the School District receives annually several thousand applications from prospective teachers. To manage the sizable number of job inquiries that it receives, the School District has implemented a standard procedure for processing and retrieving employment applications. Upon receiving an inquiry about a vacant teaching position, the School District requests that the prospective teacher complete and return two forms—an application and an information data sheet ("Data Sheet"). Although these documents seek information concerning the applicant's work experience, educational background and teaching preferences, neither form requests information about the race of the prospective teacher.

---

[2] Naperville is located in DuPage County, Illinois—a suburban area adjacent to the city of Chicago. According to 1990 census data, white, non-Hispanic individuals comprise roughly 93% of DuPage County's population.

Once these materials are returned, the School District enters the information from the Data Sheet into a central database, and the applicant then becomes an active candidate for employment. An individual will not be considered for employment if he fails to return his Data Sheet. Each fall, an active candidate receives from the School District a new Data Sheet. That document must be completed and returned in order to retain one's status as an active candidate; failure to resubmit the Data Sheet places an applicant on inactive status and leads ultimately to expungement from the employment database.

With regard to teaching vacancies, a school's principal establishes the specific hiring criteria for the open position. The principal relays this information, as well as a notice of the vacancy, to the School District's personnel office. That office then distributes postings concerning the position. The personnel office also provides the principal with a printout, drawn from the database, identifying active applicants that match the hiring criteria for the position. After considering the list, as well as any applications sent directly to him, the principal conducts interviews of those individuals that he believes are most qualified for the position. On occasion, staff members from the school conduct a second, but subsidiary, interview of the applicant. Although the principal may consider the recommendations of the staff, he ultimately determines which applicant is best suited for the position. Finally, the Assistant Superintendent for Personnel reviews the applicant's credentials and, based largely on the recommendation of this official, the Board of Education approves the hiring. Once approved, the new teacher undergoes a mandatory criminal background check conducted by the Illinois State Police Department ("ISPD"). The ISPD's criminal background form requires the teacher to identify his race.

In the fall of 1994, Ms. Bennett submitted an application, a completed Data Sheet and a current résumé to the School District. The application materials detailed Ms. Bennett's work experience and qualifications. Certified by the State of Illinois to teach kindergarten through ninth grade, Ms. Bennett possessed several years of teaching experience with a marked emphasis in special education. In obtaining her master's degree from the University of Houston, she had attained high grades. Ms. Bennett contends that the application materials she received from the School District contained an additional document—the ISPD's criminal background form. According to Ms. Bennett, she completed this form—including the portion asking her to identify her race—and returned it to the School District.

Soon after Ms. Bennett submitted her materials, she received an interview with the School District for a part-time teaching position. Carol McGuff, a principal with the School District, interviewed Ms. Bennett for a teaching vacancy in the Chapter One Mathematics program, an initiative for students performing poorly, or at risk of performing poorly, at their grade level. According to McGuff, after conducting the interview, she concluded that Ms. Bennett lacked the requisite qualifications for the position. Despite this initial impression, the principal permitted three members of her school's faculty, all of whom were white, to conduct a second interview of Ms. Bennett.[3] Two of the staff members concluded that Ms. Bennett did not possess the skills applicable to the position; the third person was unable to remember the encounter. McGuff did not recommend Ms.

---

[3]  McGuff typically permitted staff members to participate in the interview process and provide input concerning the applicant's qualifications. However, she alone made the hiring recommendation to the personnel office.

Bennett for the position. The School District later hired another applicant to fill the vacancy. That person not only possessed four years of teaching experience but also trained student teachers at National Lewis University in development of math curriculum and lesson planning. The successful applicant also had served as an active member and lecturer of the National Council of Teachers of Mathematics.

In September 1994, Jack Hinterlong, a principal with the School District, interviewed Ms. Bennett for another vacancy, a fifth-grade teaching position. According to the principal, he sought a candidate who, among other things, possessed a background in social studies. After interviewing Ms. Bennett, Hinterlong decided that she did not meet the criteria for the position. The School District filled the vacancy with an individual who possessed thirteen-years teaching experience, the bulk of which was at the fifth-grade level.

Ms. Bennett applied for several other teaching positions within the School District. She sent letters directly to the principals at whose schools the vacancies existed. Although Ms. Bennett did not receive any further interviews, she resubmitted her Data Sheet to the School District during November 1994. In the fall of 1995, however, she failed to return her Data Sheet.

## B.  District Court Proceedings

In this action, Ms. Bennett alleged that the Board had engaged in racially discriminatory hiring practices in violation of Title VII, § 1981, § 1983 and the Fourteenth Amendment of the Constitution of the United States. Although the complaint contained numerous contentions, it repeatedly alleged that the Board employed all-white screening committees that precluded African-American applicants from

obtaining positions with the School District. In addition, Ms. Bennett asserted that she was more than qualified for the positions for which she had applied but had not received interviews.

At the close of discovery, the parties filed cross-motions for summary judgment.[4] The Board contended that Ms. Bennett had failed to prove either disparate treatment or disparate impact under Title VII. In particular, the Board emphasized that the applicants it had hired for the September positions possessed superior qualifications to those of Ms. Bennett. Because her disparate treatment claims were without merit, the Board argued, Ms. Bennett also could not satisfy the requirements of § 1981. Turning to the disparate impact claims, the Board contended that Ms. Bennett not only had failed to prove the existence of an employment practice that adversely impacted minorities but also had proffered unreliable statistical data in support of her position. Finally, the Board submitted that the § 1983 claims were infirm because Ms. Bennett offered no evidence that the Board had adopted a policy or custom that resulted in the deprivation of her constitutional rights.

In response, Ms. Bennett submitted that the Board construed too narrowly the class of jobs for which she had been eligible but had not been hired. Although Ms. Bennett only tangentially referred to these jobs in her Rule 56.1 statement of undisputed material facts, she contended that she was qualified for these positions. Because the Board had not articulated a legitimate nondiscriminatory reason for failing to hire her for this class of jobs, she argued that it could not

---

[4]   More precisely, the Board sought the entry of summary judgment in its favor on all of Ms. Bennett's claims. In comparison, Ms. Bennett's cross-motion was limited in nature. She only filed for summary judgment on her disparate impact claims.

prevail on these claims. With regard to her allegations under § 1983, Ms. Bennett argued that the Board adopted an unconstitutional policy of declining to hire minority applicants. Finally, having moved for summary judgment on her disparate impact claims, she contended that, based on her statistical evidence and the neutral employment practices she had identified, the Board could not escape liability on this claim.

### 2.

The district court entered summary judgment for the Board on all of Ms. Bennett's claims. The district court concluded that Ms. Bennett had failed to demonstrate the pretextual nature of the Board's nondiscriminatory reason for failing to hire her for the two September 1994 teaching vacancies. In addition, the district court found Ms. Bennett's proffered statistical evidence suffered from flaws that precluded its use to prove either her disparate treatment or disparate impact claims. The court, however, never addressed Ms. Bennett's allegations concerning the other teaching vacancies for which she had been eligible but had not received a job offer.

The district court also rejected Ms. Bennett's disparate impact theory. Although she had alleged in her motion for summary judgment numerous employment practices that purportedly had a disparate impact on minority applicants, Ms. Bennett had failed to raise all but one of these practices in her complaint or during discovery. Accordingly, the district court permitted her to raise only the single practice that had been appropriately placed in issue—the Board's alleged use of all-white screening committees when interviewing applicants. However, the district court also determined that Ms. Bennett failed to prove the existence of such

a practice. Moreover, continued the court, even assuming the admissibility of her statistical evidence, this material failed to link the hiring practice to any alleged disparity in minority representation in the School District's workforce.

Finally, the court addressed Ms. Bennett's § 1981 and § 1983 claims. Because she failed to demonstrate intentional discrimination, her § 1981 claim failed. As for her § 1983 claims, the district court concluded that Ms. Bennett had failed to prove that the School District had adopted a policy or custom that violated her constitutional rights.

## II

## DISCUSSION

We review de novo the district court's grant of summary judgment. *See Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1136 (7th Cir. 2001). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Our function is not to weigh the evidence but merely to determine if "there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In performing this task, we must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255.

## A.

We first consider Ms. Bennett's contention that, in making its hiring decisions, the Board intentionally discriminated against her on account of her race in violation of Title VII. It is well-established that Title VII prohibits an employer

from refusing to hire an applicant because of the individual's race. *See* 42 U.S.C. § 2000e-2(a)(1). To prove a violation of this provision, a plaintiff must proffer either direct or indirect evidence of the employer's discriminatory intent. Because direct evidence often does not exist in discrimination cases, most plaintiffs proceed under the indirect method of proof—the *McDonnell Douglas* test.

Under this indirect methodology, the plaintiff must present evidence sufficient to establish a prima facie case of the employer's discriminatory intent. In particular, the plaintiff must establish that: (1) he is a member of a protected class; (2) he applied for, and was qualified for, an open position; (3) the employer rejected him for the position; and (4) the employer filled the position with an individual outside of the plaintiff's protected class, or the position remained vacant. *See Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999). Once the plaintiff establishes each element of his prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its hiring decision. *See id.* If the employer satisfies this obligation, the burden of production returns to the plaintiff to demonstrate the pretextual nature of the proffered reason. *See id.*

### 1.

As a threshold matter, we briefly address the position that Ms. Bennett takes on appeal with respect to the two positions for which she received interviews. In her view, the district court should not have considered these positions because any claims stemming from them are time-barred.[5]

---

[5] Ms. Bennett states that she "explained in her summary judgment briefs that [the] September 1994 vacancies and all information related
(continued...)

More precisely, she submits that she failed to file a timely administrative complaint with the EEOC concerning these positions. Accordingly, Ms. Bennett's brief neither addresses nor challenges this portion of the district court's ruling.

Although we express no opinion on whether this portion of Ms. Bennett's complaint is time-barred,[6] we conclude that she has waived appellate review of the September interviews. "A waiver, which can be either express or implied, is an intentional relinquishment of a known right." *Miller v. Willow Creek Homes, Inc.*, 249 F.3d 629, 631 (7th Cir. 2001). In her brief, Ms. Bennett contends that "the only relevance of the September 1994 interviews . . . is that they are absolute proof that District 203 knew [her] race at all relevant times after the interview." Appellant's Br. at 15. Ms. Bennett never challenges the district court's conclusion that she failed to establish pretext concerning the Board's articulated reasons for failing to hire her for the September positions. Indeed, her brief never addresses the substantive merits of

---

[5] (...continued)
to that hiring are irrelevant to the Title VII claims, and would not be admissible at trial." Appellant's Br. at 15. The record, however, belies this contention; it is clear Ms. Bennett intended for these two incidents to comprise a portion of her discrimination claims against the Board.

[6] As a general rule, before a plaintiff may institute an action in federal court under Title VII, he must file a timely complaint with the EEOC detailing the discriminatory conduct that forms the basis of his allegations. *See Hentosh v. Herman M. Finch Univ. of Health Sciences/ Chicago Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999). Although the failure to file an initial complaint with the EEOC "certainly places a significant legal and pragmatic burden on the plaintiff," it is not a jurisdictional requirement. *Daugherity v. Traylor Bros., Inc.*, 970 F.2d 348, 352 (7th Cir. 1992). Indeed, the Board has never argued that this portion of Ms. Bennett's claim is time-barred.

this portion of the district court's ruling. Accordingly, Ms. Bennett has waived any appellate review of this aspect of her case.

### 2.

We next address the substance of Ms. Bennett's remaining disparate treatment claims. Ms. Bennett contends that, because of her race, the Board declined to hire her for roughly nineteen teaching vacancies that were available while she remained an active candidate for employment with the School District via its central database. Moreover, she emphasizes that the district court failed to address this aspect of her claims. In response, the Board submits that Ms. Bennett never properly developed these allegations before the district court. In the alternative, it argues that Ms. Bennett failed to establish a prima facie case of discrimination with regard to these claims.

Although it is evident that the district court did not address this aspect of Ms. Bennett's case,[7] we con-

---

[7]  We, however, do not fault the district court for this oversight. Ms. Bennett scarcely developed the factual allegations underlying these claims in the parties' Rule 56.1 Statements of Undisputed Material Facts. The Board's Rule 56.1 statement, submitted in support of its motion for summary judgment, focused primarily on the September interviews. In her supplemental statement of facts, Ms. Bennett, in the most conclusory manner, stated:

> 107. Ms. Bennett was qualified and eligible to be hired for Type 03 certified positions grades K-9 in District 203 from August 29, 1994 until February 17, 1996. (Ex. 2, 4, 17 [.])

> 108. Exhibit 16 is the teachers service reports [sic] that shows the new hires for the time period that includes the time Ms. Bennett was eligible for employment with District 203.

(continued...)

clude that summary judgment for the Board remains appropriate because there is a failure of proof with regard to these allegations. Ms. Bennett simply has failed to allege sufficient facts to prove a prima facie case of employment discrimination with regard to these positions. In particular, although Ms. Bennett contends that she was qualified for nineteen positions that were filled while her name was in the database, she provides us with no indication as to the specific hiring criteria for these positions. The record contains no postings or descriptions that detail the requisite qualifications for these vacancies. Thus, we simply cannot accept Ms. Bennett's contention that, because she holds a teaching certificate and a master's degree, she automatically was qualified for these particular positions. Ms. Bennett had ample opportunity to develop this record before the district court. She failed to do so.

We recognize that Ms. Bennett has identified several white teachers hired for these vacancies that purportedly had lesser credentials than she possessed. For instance, Ms. Ben-

---

[7]  (...continued)

 109. Except for the Highlands fifth grade teaching position and the Scott Chapter One position, the Defendant's motion for summary judgment did not give an allegedly non-discriminatory reason for not hiring Ms. Bennett. (See Defendants [sic] summary judgment motion [.])

R.110, ¶¶ 107-09. Ms. Bennett neither elaborated on the job qualifications for these positions nor identified the individuals who filled these vacancies. In her response to the Board's motion for summary judgment, Ms. Bennett provided some minimal elaboration on these claims. We have noted that a district court is "entitled to disregard references to depositions and other discovery materials that appeared only in the supporting brief, and to decide the motion based on the factual record outlined in" the undisputed statement of facts. *Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999).

nett emphasizes that she has a higher grade point average than some of the individuals hired; she also notes that she holds a master's degree while some of these individuals did not. Although many of the comparisons in Ms. Bennett's brief are either inaccurate or incomplete,[8] they suffer from a more fundamental flaw. The comparisons are meaningless absent some information concerning the hiring criteria for these positions. We conclude that the entry of summary judgment on these claims is appropriate.

### 3.

Finally, we must address Ms. Bennett's contention that she submitted statistical evidence that demonstrates the Board engaged in intentional discrimination. In particular, Ms. Bennett contends that the district court erred in characterizing her expert's statistical analysis as unreliable. Arguing that her expert used a sound methodology in preparing his data, Ms. Bennett contends that the statistical evidence is so stark as to warrant only one conclusion: the School District intentionally discriminates on the basis of race.

Although we note that statistical evidence, standing alone, is generally insufficient to prove intentional discrimination, *see Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 423 (7th Cir.

---

[8] For instance, Ms. Bennett posits that, while she had four years of teaching experience, an individual named Hartman who had little or no teaching experience was hired for a 5th-grade teaching position. The record, however, indicates that Hartman had, at a minimum, eight years of teaching experience at the 5th-grade level. Ms. Bennett also argued that her grade point average was higher than the undergraduate marks of an individual named Bartkus. The statement is only partially true as Bartkus' graduate school grade point average was higher than Ms. Bennett's.

2000), we nevertheless consider whether the district court erred in its analysis of Ms. Bennett's statistical evidence. In conducting a statistical analysis, an expert need not include all measurable variables in his study. *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986). However, certain factors are crucial to statistical evidence in Title VII cases. In particular, "properly identifying the relevant labor market is the key ingredient in proving Title VII discrimination through the use of statistics." *EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292, 302 (7th Cir. 1991). In defining the proper labor market, the expert must identify not only those individuals who are qualified for the position but also those who are potentially interested in it. *See id.*

In this case, Ms. Bennett's expert conducted three statistical analyses that he contends indicate the School District has engaged in discriminatory hiring practices. Specifically, he first compared the racial composition of the School District's workforce with that of the general teacher pool in the State of Illinois during the 1994-1995 school year. The expert also compared the racial composition of the teachers hired in the School District between 1990-1997 with that of teachers employed in the Chicago Primary Metropolitan Statistical Area ("Chicago PMSA") during the same period. Finally, he conducted an analysis comparing the racial composition of the School District's applicant flow data to the approximate number of teachers employed in the Chicago PMSA.

After reviewing this study as well as the expert's deposition testimony, we conclude that the district court did not err when it characterized this statistical analysis as unreliable. The study contains several inherent flaws. First, in conducting his analysis, the expert did not consider the degree to which potential applicants from a place such as the Chicago PMSA would be interested in working in Naperville. During deposition testimony, he conceded that he was un-

familiar with the geographic relationship between Naper-
ville and the Chicago PMSA; the study, in fact, did not
account for commuting patterns within the Chicago metro-
politan area—a nondiscriminatory factor that may impact
significantly the validity of the results. Moreover, as the
Board emphasizes, Illinois was selected as a benchmark
because, in the expert's estimation, it seemed reasonable to
expect that the School District would hire applicants from
within the state. The expert acknowledged that he did not
attempt to verify this theory. Because of these infirmities,
this analysis was properly deemed unreliable. Because Ms.
Bennett has failed to present evidence in support of her
disparate treatment claims, we conclude that the district
court properly entered summary judgment on this portion
of her case.

### 4.

Ms. Bennett also contends that the Board's actions vio-
lated § 1981. "The same standards governing liability under
Title VII apply to § 1981 claims." *See Gonzalez v. Ingersoll
Milling Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998). Be-
cause we have concluded that Ms. Bennett is unable to
prove her allegations of disparate treatment under Title VII,
her § 1981 claim must fail as well. The district court cor-
rectly entered summary judgment for the Board on Ms.
Bennett's § 1981 claim.

### B.

Ms. Bennett also submits that the Board has adopted
certain employment practices that create a disparate impact
on the ability of African-Americans to obtain positions with
the School District. A disparate impact claim exists when an
employer has adopted a particular employment practice

that, although neutral on its face, disproportionally and negatively impacts members of one of Title VII's protected classes. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986-87 (1988). To establish a prima facie case of disparate impact, a plaintiff first must "isolate and identify 'the specific employment practices that are allegedly responsible for any observed statistical disparities.' " *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996) (quoting *Watson*, 487 U.S. at 994). Isolated and singular incidents generally are insufficient to constitute a specific employment practice. *See, e.g., Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1156 (7th Cir. 1997). Second, the plaintiff must establish a causal connection between the employment practice and the statistical disparity, offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotion because of their membership in a protected group." *Vitug*, 88 F.3d at 513 (quoting *Watson*, 487 U.S. at 994).

### 1.

We briefly consider whether Ms. Bennett has identified a particular employment practice of the School District that has led to a disparate impact on African-American applicants.[9] Ms. Bennett contends that the district court erroneously limited its analysis on this matter to a single employ-

---

[9] The Board disputes whether Ms. Bennett actually raised a disparate impact claim with the EEOC. Her charge before the EEOC did not contain such an allegation. Ms. Bennett contends, however, that she sent a letter to the EEOC making such a claim. The EEOC has no record of receiving such a letter, and Ms. Bennett has no documentary proof that it was sent. For purposes of this appeal, we shall resolve this factual dispute in favor of Ms. Bennett and assume that the letter was filed with the EEOC.

ment practice—the School District's alleged use of all-white screening committees to interview applicants. According to Ms. Bennett, she identified at least three other practices that the district court failed to consider, including the School District's alleged failure to hire minorities, its alleged deferral of hiring decisions to the unchecked discretion of an all-white administrative staff and its alleged violation of state law by failing to implement a minority recruitment policy.

The district court correctly determined that Ms. Bennett ought not be permitted to rely on these additional practices in litigating her disparate impact claim. In her letter to the EEOC, Ms. Bennett charged the School District with, among other things, "[p]racticing a hiring system that excludes African-American teachers from the team that selects and approves new teachers." R.110, Ex.5. Notably, the letter does not reference these other practices. Moreover, during discovery, the Board, through interrogatories, specifically asked Ms. Bennett to identify all policies and practices of the School District that discriminated against minorities. In response, Ms. Bennett failed to raise any of the additional practices on which she now relies. Indeed, in her response to the Board's Rule 56.1 Statement of Undisputed Material Facts, Ms. Bennett agreed with the Board's contention that

> [t]hrough discovery, Defendants specifically requested Plaintiff to identify all neutral hiring policies or practices which formed the basis of her disparate impact claim. In her written discovery responses, Plaintiff identified only the District's use of Caucasian interviewers.

R.98, ¶ 82; *see* R.110, ¶ 82. Although the Rule 56.1 Statement that Ms. Bennett submitted in support of her cross-motion for summary judgment contains tangential references to some of these other practices, she simply failed to identify them during discovery. Because the Board objected to the

late inclusion of these practices, there was no constructive amendment of the complaint, and the district court properly declined to consider them. *See Whitaker v. T.J. Snow Co.,* 151 F.3d 661, 663 (7th Cir. 1998).

**2.**

Although Ms. Bennett properly raised the remaining purported practice—the use of all-white screening committees—the district court correctly determined that she had failed to submit facts in support of this allegation. Undoubtedly, three white faculty members spoke with Ms. Bennett when she interviewed for the first position with the School District. She has presented no evidence other than this single incident, however, to support her contention that the School District employs all-white screening committees during the interview process. Based on this record, the district court properly held that Ms. Bennett failed to prove the School District had established a policy or practice of using all-white screening teams.

**C.**

Finally, we address Ms. Bennett's contention that she has asserted viable claims under § 1983 against the Board members, in their official and individual capacities. In general terms, to maintain a claim under § 1983, a plaintiff must demonstrate that a government official, acting under color of state law, violated her constitutionally protected rights. *See Stagman v. Ryan,* 176 F.3d 986, 999 (7th Cir. 1999). In this case, Ms. Bennett contends that the Board violated the rights guaranteed to her under the Equal Protection Clause of the Fourteenth Amendment. As such, she must prove the Board engaged in intentional discrimination. *See McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 513 (7th Cir. 1993).

We first turn to Ms. Bennett's claims against the Board members in their official capacities. A court may not hold a government entity, such as a board of education, liable under § 1983 unless the entity adopted a policy or custom that resulted in the deprivation of the plaintiff's constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Kujawski v. Bd. of Comm'rs of Bartholomew Co.*, 183 F.3d 734, 737 (7th Cir. 1999). A plaintiff may prove "the existence of municipal policy or custom in one of three ways: proof of an express policy causing the loss, a widespread practice constituting custom or usage that caused the loss, or causation of the loss by a person with final policymaking authority." *Kujawski*, 183 F.3d at 737.

Referencing the 1992 version of School District Policy 4116 ("Policy 4116"), Ms. Bennett contends that the Board "implemented a hiring policy that expressly stated, they had no reason for recruiting" minorities. Appellant's Br. at 23. This allegation misconstrues Policy 4116. In its entirety, the policy states:

> The Board of Education has studied the types of minority recruitment and hiring efforts which are required or appropriate, including the issue of whether there is a local factual basis for adopting an affirmative hiring and recruitment plan for minorities. The Board of Education has found no sufficient factual basis for adopting an affirmative hiring and recruitment plan for Blacks, Hispanics, Native Americans or Asian and Pacific Islanders.

> Therefore, the District shall continue to recruit qualified minority job applicants and to hire qualified job applicants on a non-discriminatory basis in accordance with applicable laws. The Superintendent is directed, at least once every five years, to analyze whether minorities are

under-represented in any category of District employ-
ment due to acts of past discrimination.

R.110, Ex.7. Contrary to Ms. Bennett's allegations, the plain
terms of the policy show no intent to discriminate against
minority applicants. Although declining to implement an
affirmative action policy, the Board reaffirmed its commit-
ment to hiring individuals on a nondiscriminatory basis.
Simply put, Policy 4116 does not establish that the Board
adopted a policy designed to intentionally violate the con-
stitutional rights of minority job applicants.

In addition, Ms. Bennett further submits that the president
of the Board, Ms. Davenport, "admits that she knew of the
state law" requiring implementation of a minority recruit-
ment policy "but she felt there was no need to follow it."
Appellant's Br. at 24. This submission is not an accurate
construction of the record. In her affidavit, Ms. Davenport
referenced a provision of the Illinois School Code concern-
ing minority recruitment policies. Under Illinois law, each
school district within the state was "[t]o develop and im-
plement, by 1991, a policy of recruitment and hiring of
minority teachers . . . ." 105 ILCS 5/10-20.7a. Ms. Davenport
indicated that, in accordance with this mandate, the School
District conducted a review of its employment practices and
concluded that grounds did not exist at that time to imple-
ment an affirmative action plan.[10] The Board did not in-
dicate that it did not have to follow state law. It conducted
an internal review of its hiring practices and concluded an

---

[10] The School District concedes that it implemented its policy a year
later than called for by the Illinois statute. To the extent Ms. Bennett
contends that this delay evidences the Board's intent to discriminate
against minorities, the argument is without merit. Ms. Bennett has
proffered no evidence that demonstrates the delay in implementing
the policy harmed her in any manner.

affirmative action plan was not warranted. These statements are not probative of an official policy or custom to discriminate against minority applicants.

In the most conclusory manner, Ms. Bennett posited two further arguments in support of her contentions. First, she indicated that the Board admitted to leaving hiring decisions to the unchecked discretion of an all-white supervisory core. Ms. Bennett's citation to the record, however, does not bear out this alleged concession. In addition, referring tangentially to a demographic study conducted at the behest of the Board, Ms. Bennett argues that the Board possessed statistical evidence that it failed to hire minority applicants. The study, however, indicated that the School District had not engaged in discriminatory hiring practices towards minority applicants. Accordingly, this argument is also without merit. Because Ms. Bennett has failed to prove the existence of a policy or custom that impinged on her constitutional rights, the district court correctly concluded that she cannot establish liability against the Board under § 1983.

In addition, Ms. Bennett contends that the court should hold individual school officials liable under § 1983. We, however, already have addressed and rejected the contentions Ms. Bennett raised in support of her § 1983 claims. Accordingly, the district court correctly entered summary judgment on this portion of Ms. Bennett's claims.

## Conclusion

The district court properly granted summary judgment to the Board. Accordingly, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*