**Dennis H. HARVEY, Plaintiff–Appellant,**

v.

**MAYTAG CORPORATION, Defendant–Appellee.**

No. 03–3409.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 2004.

Decided July 23, 2004.

Gene Gross, Reed, Heller, Mansfield & Gross, DuQuoin, IL, for Plaintiff–Appellant.

Linzey D. Jones, Jr., Pugh, Jones & Johnson, Chicago, IL, for Defendant–Appellee.

Before CUDAHY, RIPPLE, and WILLIAMS, Circuit Judges.

## ORDER

Dennis H. Harvey, an African–American male, sues his former employer, Maytag Corporation, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to e–17, and 42 U.S.C. § 1981, alleging a hostile work environment and discriminatory discharge. The district court granted summary judgment for Maytag, and we affirm.

## BACKGROUND

The following facts come from witness testimony during the arbitration hearing, as well as depositions, affidavits, and May-

tag's employment records. From 1980 until his termination in April 2000, Mr. Harvey, a union employee, worked for Maytag at its plant in Herrin, Illinois, in various capacities, including as a forklift operator in the last several years. Maytag's collective bargaining agreement with the union permits firing only for "just cause," defined as "willful disregard of or refusal to comply with [Maytag's] rules or proper orders and instructions." Attached to the collective bargaining agreement is a list of rules including one forbidding the use of "profane language of a personally degrading nature to any other person" and another prohibiting threatening physical harm to any employee. Should an employee receive a final warning for violating either of these two rules, he may be discharged after committing another violation. In May 1999 Maytag also distributed its Anti–Harassment Policy and Workplace Violence Policy to all its employees and posted the policies on bulletin boards throughout the plant.

During his time at Maytag, Mr. Harvey personally endured two episodes of racial harassment from coworkers and heard three supervisors make allegedly racist remarks. The main incident involved an unknown employee's unauthorized use of the public address system in August 1999 [1] to direct racial slurs at Mr. Harvey. Although Mr. Harvey felt threatened by these offensive remarks, they did not affect his ability to do his job. After hearing these unauthorized announcements several times, Mr. Harvey asked his supervisor, Bob Leeper, whether he had heard the remarks; Mr. Leeper responded no. But Mr. Harvey never officially reported these remarks to management. Nonetheless, shortly after Mr. Harvey had spoken to his supervisor, Bob Witherspoon, a member of management, and Mary Lou Baxter, a Hu-

man Resources manager, separately apologized to Mr. Harvey for these unauthorized announcements and assured him that they would punish whomever was responsible if they caught him. Then, taking measures to prevent a recurrence, Ms. Baxter blocked access to the PA, although she eventually had to reopen the extensions so that supervisors could perform their jobs effectively. After access was restored, Mr. Harvey asserts, the racist announcements resumed. But Mr. Harvey remembers no specifics about the frequency or dates of these recurrences, except for the racial slur directed to him over the PA his last day. And he never reported further misuse of the PA to a supervisor or management.

The second episode of harassment stemmed from what Mr. Harvey believed to be a "hangman's noose" [2] placed on his forklift (which others sometimes used during his off-shifts) and on those of several other employees, specifically Gary Gurley. According to Mr. Harvey, Mr. Gurley had placed a stuffed animal gorilla in a noose hanging from his own forklift sometime in either February or November 1999 or January 2000. When Mr. Harvey confronted Mr. Gurley about the noose over the radio with others listening, Mr. Gurley made a remark to the effect of "[i]t could be you" and that he was going to bring a longer rope when he lynched Mr. Harvey. After this conversation with Mr. Gurley, Mr. Harvey asked Mr. Leeper why some of the forklift operators had hangman's nooses on their forklifts. Responding with a laugh, Mr. Leeper said he did not know but told Mr. Harvey to ask them. When Mr. Harvey confronted Mr. Gurley again to ask why he had a noose, Mr. Gurley explained that the "noose" was "to hold onto." Employees confirm that Mr. Gurley and other

---

**1.** Maytag maintains that these events occurred in August 1998.

**2.** Another employee attested that the rope was not a noose but a "looping-type hand thing."

forklift drivers hang onto the rope, which hung behind their heads, when driving in reverse. Following this conversation, Mr. Harvey never raised the subject of the noose or Mr. Gurley's racially charged threats either to Mr. Leeper or anyone else in management. In addition to these two episodes, Mr. Harvey attests that he heard three unrelated racist comments made by supervisors, with the last comment occurring in 1993 or 1996.

Turning to the events leading up to Mr. Harvey's termination, the record establishes that at the time of his discharge Mr. Harvey was on final warning status for using language of a personally degrading nature to a female employee concerning her looks and weight. Receipt of this final warning put Mr. Harvey on notice that future valid complaints of harassment against him would result in termination.

Then in late March 2000, a new employee, Lisa Wade, complained to her supervisor that Mr. Harvey had been sexually harassing her. After her supervisor notified Human Resources, Ms. Wade filed a formal complaint on April 3, 2000. Specifically, Ms. Wade alleged that two months earlier Mr. Harvey had asked her, "[D]o you have any black in you?" When she responded, "No," he said, "No, Lisa, have you ever had any black in you, about 10½ inches?" That same day, Ms. Wade further alleged, Mr. Harvey made an obscene gesture with a banana. Ms. Wade also claimed that Mr. Harvey had twice rubbed her back. Ms. Wade believed that, upon learning that she planned to file a complaint, Mr. Harvey retaliated against her by "messing with [her] parts" on the pump table and tried to ruin her reputation, informing other workers that she would "get them in trouble if they went near" her. According to Ms. Wade, Mr. Harvey also asked a coworker to beat up Ms. Wade for money. Two employees, one of whom was Ms. Wade's boyfriend, corroborated these threats in statements to Human Resources.

In response to Ms. Wade's complaint, Maytag transferred her the next day to the second shift, so that she would not work with Mr. Harvey while the company investigated her allegations. Although Maytag had not yet formally notified Mr. Harvey of Ms. Wade's complaint, he had heard rumors about it from coworkers, and he concedes that he might have told another coworker that something might happen to Ms. Wade if she pursued her complaint. In a statement submitted to Jim Cook, the director of Human Resources, a coworker corroborated this threat.

"The straw that broke the camel's back," according to Mr. Cook, was Mr. Harvey's arrival at the plant on April 10, 2000, during his off-hours. Ms. Wade and her boyfriend believed that Mr. Harvey came to plant to intimidate her in retaliation for her filing her complaint. Ms. Wade complained about Mr. Harvey's appearance at the plant and sought security guards to escort her to her car and police surveillance of her house. Security then left a report of the incident and witness statements for Human Resources.

The next day, Mr. Cook headed an investigation into the incident and the harassment. Mr. Harvey was officially notified of Ms. Wade's complaint later that day during a meeting with Mr. Cook, Ms. Baxter, and his union representative. Mr. Harvey denied that he ever had harassed Ms. Wade or even seen her that evening at the plant, or that his purpose in going there was to intimidate her. Instead, Mr. Harvey asserted that he went to the plant only to see two other colleagues and retrieve his jacket.

After reviewing the statements by Ms. Wade and other coworkers and talking to Mr. Harvey, Mr. Cook believed that Mr. Harvey had violated Maytag's Workplace

Violence Policy and Anti–Harassment Policy and had used profane language of a personally degrading nature. Specifically, Mr. Cook determined that, despite Mr. Harvey's assertion to the contrary, he had made unwelcome verbal statements toward Ms. Wade, creating a hostile, intimidating, and offensive work environment, and then, through his comments to other coworkers, threatened retaliation against Ms. Wade if she pursued her complaint. Mr. Cook terminated Mr. Harvey on April 11, 2000. In the past, Maytag had fired three white employees for similarly violating these policies, including Charles Hodge for throwing a tomato at a coworker, Raymond Minor for twisting the arm of a coworker, and Jim Morrison for threatening another coworker. Maytag, however, could not name any individuals that it had disciplined simply for being at the facility during their off-hours.

Following his termination, Mr. Harvey pursued a discriminatory discharge claim through union grievance procedures. After a hearing with 18 witnesses, an arbitrator determined that Maytag had just cause for firing Mr. Harvey. Mr. Harvey also submitted a claim to the Illinois Department of Human Rights on June 19, 2000, and, upon receiving his right to sue letter, filed a timely complaint in district court on April 16, 2002.

Granting summary judgment to Maytag, the district court concluded that Mr. Harvey's hostile work environment claim failed because Maytag had not been negligent in discovering or remedying the harassment, and that two comments by supervisors over five years were not pervasive enough to constitute harassment. Turning to the discriminatory discharge claim, the court concluded that Mr. Harvey could not establish his prima facie case because he was not meeting the legitimate expectations of his employer and no similarly situated individuals were treated less favorably. Nor

could Mr. Harvey demonstrate that Maytag's proffered reason for firing him—violating its Anti–Harassment Policy and Workplace Violence Policy—was a pretext for a discriminatory motive.

## DISCUSSION

On appeal Mr. Harvey raises identical claims under Title VII and § 1981, challenging the district court's grant of summary judgment on both his hostile work environment claim and his discriminatory discharge claim. Because we evaluate Title VII and § 1981 claims under the same rubric, we need not address them separately. *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1028 (7th Cir.2004). The district court's decision to grant summary judgment is reviewed de novo, taking facts and inferences in favor of Mr. Harvey, the nonmoving party. *See, e.g., Williams v. Seniff*, 342 F.3d 774, 781 (7th Cir.2003).

### A.  Hostile Work Environment

Turning first to the hostile work environment claim, Mr. Harvey contends that the district court erred in concluding that, based on the summary judgment evidence, the incidents of harassment were not pervasive and that Maytag had made reasonable efforts to remedy the situation. According to Mr. Harvey, the evidence showed that Maytag was negligent in stopping employees from using the PA to direct racial slurs toward him because such incidences continued after Maytag restored access to the system. Mr. Harvey also challenges the district court's conclusion that the evidence established that employees used the "nooses" for alternate purposes, arguing that the meaning behind the "nooses" was a genuine issue of material fact.

To succeed on a claim for racial harassment, the plaintiff must establish that the relevant conduct was so severe or perva-

sive that a reasonable person would find it hostile or abusive, and that the plaintiff actually did. *See Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 807 (7th Cir. 2000). When determining whether the conduct objectively created a hostile work environment, we consider the frequency of the discriminatory conduct, whether it was physically threatening or humiliating rather than simply an offensive utterance, and whether it unreasonably interfered with an employees's work performance. *Hilt–Dyson v. City of Chicago,* 282 F.3d 456, 463 (7th Cir.2002). Prompt discovery of the harassment and the taking of reasonable steps to remedy it, however, allows an employer to avoid liability. *Williams,* 361 F.3d at 1029.

■ In this case, regardless of whether the incidents constituted harassment, Maytag was not negligent in discovering and correcting the conduct. Despite Mr. Harvey's failure to ever report any form of harassment to management, Ms. Baxter and Mr. Witherspoon independently learned about the racial slurs broadcast over the PA and restricted access for a period of time to that system. Maytag restored access only when it became necessary for the effective performance of supervisory duties. And although Mr. Harvey asserts that misuse of the PA resumed, his vague recollection without any specific dates or details (with the exception of the racist remark made on his last day) cannot suffice to establish that this harassment continued unabated. *See Allen v. Mich. Dep't of Corrs.,* 165 F.3d 405, 416–17 (6th Cir.1999) (vague allegations of harassment without reference to specific dates, instances, or events not sufficient to survive summary judgment); *Carter v. Ball,* 33 F.3d 450, 461–62 (4th Cir.1994) (same). In any event, even though several months before the remarks were first made Maytag sent to every hourly employee and posted on bulletin boards its anti-harassment policies designating Ms. Baxter or Mr. Cook as the point people for any harassment claims, Mr. Harvey did not report any continued harassment, nor is there evidence that Maytag knew of it. *Durkin v. City of Chicago,* 341 F.3d 606, 612 (7th Cir.2003) (employees must use proper channels to report complaints of harassment). Although its remedial measures may not have prevented all future incidents, as evident by the racist remark on Mr. Harvey's last day of work, restricting access to the PA temporarily was a reasonable step, given Maytag's ignorance about any continued harassment. *See Williams,* 361 F.3d at 1031 ("Although the process may have been imperfect, it was not negligent.").

Mr. Harvey also never complained about Mr. Gurley's racist threats regarding the "hangman's noose" to his supervisor or management, so Maytag cannot be held negligent for failing to remedy this harassment. *See Hall v. Bodine Electric Co.,* 276 F.3d 345, 356 (7th Cir.2002) (notice and knowledge of harassment is prerequisite for liability in coworker harassment claims). Mr. Leeper just knew that Mr. Harvey called these ropes "nooses," but Mr Harvey did not tell Mr. Leeper that he interpreted the "nooses" to be racially charged threats. *See Cooper–Schut v. Visteon Automotive Sys.,* 361 F.3d 421, 426–27 (7th Cir.2004) (employee must provide enough information for employer to know he is harassed based on protected class). And the "noose" alone would not have alerted Mr. Leeper to its allegedly racist message because he could have reasonably reached the same conclusion other employees did—that it was a handhold. Furthermore, Mr. Leeper never heard back from Mr. Harvey about the "nooses," so he may have assumed that Mr. Harvey was satisfied with whatever explanation Mr. Gurley gave.

Finally, to the extent that Mr. Harvey argues that the three unrelated comments by supervisors constituted racial harassment, those claims are time-barred. *See Jones v. R.R. Donnelley & Sons Co.,* — U.S. —, 124 S.Ct. 1836, 1845–46, — L.Ed.2d —— (2004) (four-year statute of limitations for § 1981 claims); *Shanoff v. Ill. Dep't of Human Servs.,* 258 F.3d 696, 701 (7th Cir.2001) (barring events that occurred more than 300 days before filing with Illinois Department of Human Rights). In any event, Mr. Harvey has abandoned any argument concerning these three comments by failing to develop it on appeal. *See Wiley v. City of Chicago,* 361 F.3d 994, 998 (7th Cir.2004).

### B. Discriminatory Discharge

■ Mr. Harvey's discriminatory discharge claim fares no better. Mr. Harvey first attempts to prove his claim under the direct method, arguing that the prevalence of racial slurs directed toward him evidences discriminatory intent. But Mr. Harvey cannot connect his firing by Mr. Cook, the decisionmaker, with the racist slurs heard over the PA, and even concedes that management was not responsible for those inappropriate remarks. *See Adams v. Wal–Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir.2003) (must show real link between bigotry and adverse employment action).

Hence Mr. Harvey must instead proceed under the indirect method, which requires a plaintiff to establish that (1) he is a member of a protected class, (2) he was performing up to his employer's legitimate job expectations, (3) he suffered an adverse employment action, and (4) similarly situated individuals not in his protected class were treated more favorably. *Hildebrandt v. Ill. Dep't of Natural Res.,* 347 F.3d 1014, 1030 (7th Cir.2003); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. *Bennett v. Roberts,* 295 F.3d 687, 694–95 (7th Cir.2002). Once the defendant proffers a legitimate reason, the burden shifts back to the plaintiff to show that this reason is pretextual. *Id.* at 695. The parties only dispute the second and fourth prong of the prima facie case and the issue of pretext.

■ First challenging the district court's finding that he did not perform his job up to Maytag's legitimate expectations, Mr. Harvey relies upon his twenty-year work history with the company and disputes both the factual allegations of sexual harassment giving rise to his discharge and Maytag's attempts to "disparage" him by bringing up his past disciplinary violations. Because we look to an employee's performance at the time of his termination, and not his past behavior, *Peele v. Country Mutual Ins. Co.,* 288 F.3d 319, 329 (7th Cir.2002), only the final warning from 1998 for using personally degrading language, which was undisputedly still in effect, and the allegations of sexual harassment leading to his termination are relevant. But, although Mr. Harvey denies sexually harassing Ms. Wade, he concedes that he communicated a veiled threat via another employee about retaliating against Ms. Wade, and Mr. Cook considered this threat a violation of Maytag's policies. And Mr. Harvey points to no evidence demonstrating that Mr. Cook did not honestly believe that Mr. Harvey had sexually harassed or tried to intimidate Ms. Wade. Because we will not second guess an employer's policies allowing termination after a final warning for actions it honestly believed occurred and to which the employee even admits, we conclude that Mr. Harvey was not meeting Maytag's legitimate job expectations. *See Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1035 (7th Cir.1999).

Mr. Harvey also fails to satisfy the fourth prong of the prima facie case, attempting to use *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir.1994), to argue that the atmosphere of racial slurs was sufficient to show that similarly situated individuals were treated more favorably. But Mr. Harvey reads too much into *Lenoir.* In finding that the plaintiff in *Lenoir* satisfied the fourth prong of the prima facie case, this court ultimately relied upon the record, which included evidence that a similarly situated white male had engaged in the same activity and had not been punished. *Lenoir*, 13 F.3d at 1133 (citing *Lenoir v. Roll Coater, Inc.*, 841 F.Supp. 1457, 1465–66 (N.D.Ind.1992)); *see Oates v. Discovery Zone*, 116 F.3d 1161, 1172 (7th Cir.1997). Mr. Harvey, however, does not argue in this section of his brief that there were any similarly situated employees who were treated more favorably than him. And Maytag refutes any suggestion by Mr. Harvey that other white employees who entered the plant during off-hours were not disciplined, pointing out that it fired him because of what it believed his purpose was in entering the plant after his shift had ended: to intimidate and harass a coworker. Maytag is correct that Mr. Harvey's purpose makes incomparable any coworkers who entered the plant during off-hours for non-prohibited reasons without repercussion, and he cannot rely on these individuals to establish that similarly situated individuals were treated more favorably. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 547 (7th Cir.2002); *Radue v. Kimberley–Clark Corp.*, 219 F.3d 612, 617–618 (7th Cir.2000). Maytag also submits examples of two white employees that it did terminate for violating the Workplace Violence Policy and one that it discharged for threatening a coworker, which further undermines Mr. Harvey's argument that similarly situated white employees were treated more favorably. Because Mr. Harvey cannot establish a prima facie case of discriminatory discharge, the burden does not shift to Maytag to offer evidence of a nondiscriminatory reason for terminating him. *See Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 453 n. 4 (7th Cir.1998)

AFFIRMED.