LaTeirra Rachael **SUBLETT**, Plaintiff,

v.

**JOHN WILEY & SONS, INC.,
and Wiley Publishing,
Inc.,** Defendants.

No. 1:03–0347–SEB–JPG.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 30, 2004.

---

Richard L. Darst, Indianapolis, IN, for plaintiff.

Kevin S. Smith, Todd M. Nierman, Baker & Daniels, Indianapolis, IN, for defendants.

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE PLAINTIFF'S SURREPLY

BARKER, District Judge.

Plaintiff, Lattierra Rachael Sublett, is an employee of Defendant, Wiley Publishing, Inc. ("Wiley"), who is currently serving as a team leader in the Customer Care Department. She brings this action against Wiley and its parent company[1], alleging that she has received falsely critical performance reviews and has been denied promotions because of her race, African–American, or because she has made complaints regarding race discrimination. Wiley denies any discrimination and has

filed a Motion For Summary Judgment, arguing that Plaintiff has insufficient evidence to support her claims of discrimination and retaliation.

### Summary Judgment Standard

Summary judgment is only to be granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. To determine whether any genuine factual issue exists, the Court examines the pleadings and the proof as presented in depositions, answers to interrogatories, admissions, and affidavits made a part of the record. *First Bank & Trust v. Firstar Information Services, Corp.*, 276 F.3d 317 (7th Cir.2001). The Court also draws all reasonable inferences from undisputed facts in favor of the non-moving party and views the disputed evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the non-moving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather she must go beyond the pleadings and support her contentions with properly admissible evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Adherence to the Local Rules

Before examining the facts of this case in more detail, we are compelled to criticize counsel for both parties for their presentation of "undisputed" and "disputed" material facts in their briefing. Local Rule 56.1 is fairly specific with regard to

1. Because it makes no substantive difference in our analysis of the pending motions whether John Wiley & Sons or Wiley Publishing is the statutory employer of the Plaintiff, we will not seek to differentiate unless important to the discussion and will simply refer to the Defendants as "Wiley".

what the court expects litigants to do in briefing a motion for summary judgment, stating, in pertinent parts:

(a) **Requirements for Moving Party**. . . . The brief must include a section labeled "Statement of Material Facts Not in Dispute" containing the facts potentially determinative of the motion as to which the moving party contends there is no genuine issue. These asserted material facts shall be supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence either already in the record or contained in an appendix to the brief.

(b) **Requirements for Non–Movant**. . . . The brief shall include a section labeled "Statement of Material Facts in Dispute" which responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment. These facts shall be supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence either already in the record or contained in an appendix to the brief.

■ As is usually the case, the moving party (Defendant) submitted a supporting brief with the properly titled section setting forth what it claimed to be material facts not in dispute. That section is eleven pages in length and contains much more than the material facts which are "potentially determinative of the motion." And, while we allow some latitude for advocacy even in the statement of undisputed facts, the rule is intended to narrow the focus of the parties' briefing to those facts which are key to a determination of a case or of particular issues at this juncture. Stated otherwise, a submission that lays out all the things an opposing party failed to do, even if it arguably strengthens the movant's position, is beyond the contemplation of the rule. Similarly, the movant's version of all the contested facts is beyond the scope of this part of the rule. Such elaborations are argument, and should be confined to that portion of a brief. The Court is looking for a concise recitation of the unchallenged, material facts in order to determine whether a prima facie case has been made with respect to a particular claim or defense.

What was filed in the response brief in this case was an even more egregious departure from the requirements of the local rules. Plaintiff's counsel decided not to simply state the key facts in dispute, as the rule requests. Rather than follow this requirement, the briefing includes a section titled "Plaintiff's Statement of Additional And Material Facts in Dispute," consisting of fourteen pages of confusing, cut-and-paste excerpts from affidavits of various witnesses and replete with irrelevant and self serving adversarial embellishments. For example, including facts regarding the "sexuality" of various members of the Wiley staff could not be more irrelevant to a resolution of this case and citing the opinion of a non-decision maker with respect to the general circumstances of her own termination, months before the alleged discrimination or retaliation allegedly suffered by Sublett, can have no bearing on the decision we are being asked to make on summary judgment. These aspects of the response brief are not only ineffective, they thwart the whole purpose of the requirement to narrow the focus of the inquiry by identifying and challenging material facts that Wiley claimed to be undisputed. This is litigation by inundation, a practice rarely helpful to the party engaging in such tactics and never helpful to the court.

■ Sublett has also filed a Surreply Brief. Local Rule 56.1 limits the availability of a surreply only to situations where the moving party has, in its reply, relied upon evidence not previously cited or objected to the non-moving party's evidence. Wiley thus has filed a Motion to Strike Plaintiff's Surreply, claiming that Sublett's brief goes far beyond responding to new evidence or to the objections it made in its reply brief, and apparently not wishing to miss the chance to restate his position, Plaintiff's counsel responds at length, repeating his various objections and citing the new evidence addressed in the surreply. This adversarial approach is truly bewildering.

Our review discloses that parts of the surreply are certainly little more than a rehash of arguments already made (and responded to and made again). However, we also note that new evidence was offered and objections were included in Wiley's reply brief, thus laying a basis for a surreply. By the time we make our way through the excessively long and confusing briefing concerning what we view as not particularly intricate facts or complicated law, we must admit that any rehashing of prior arguments in the surreply has had little, if any, effect on our analysis. In order to avoid spending an inordinate amount of time deciding which portions of the surreply deserve to be stricken as inappropriate resurrections of previous arguments, we shall simply admonish counsel not to assume that the party who speaks last or who files the longest briefs is likely to prevail.

We expect more from counsel—justifiably so. The Local Rules are the product of careful thought and long hours of deliberation by attorneys who voluntarily serve on the Local Rules Advisory Committee. Further consideration is given by the judges of this court in adopting the Local Rules to guide litigation in this district. Ignoring these efforts, especially with regard to summary judgment procedures, is unwarranted and unwise. Counsel are expected to exert their best efforts to adhere to these rules, knowing that the consequences of doing otherwise could be dire.

*Factual Background*

Ms. Sublett began working for IDG Books Worldwide, Inc., ("IDG")[2] on June 1, 1999, as a customer service representative, which position was thereafter retitled as customer care representative ("CCR"). Sublett has a high school diploma, has completed an eight-month administrative assistant program at Midwest Career College and acquired experience in customer service with two previous employers. She was initially interviewed for this position by Beth Sanchez, her then supervisor, and Linda Perkins, the manager of the Customer Care Department. When hired, Ms. Sublett was the only African–American in the Customer Care Department.

In 2000, IDG hired Felicite Pickens, an African–American, as a supervisor in the Customer Care Department. In the summer of 2000, re-organization of the department occurred, resulting in the creation of

2. After IDG was acquired, its name was changed to Hungry Minds, Inc. sometime in the summer of 2000. Thereafter, it was purchased by John Wiley & Sons, Inc. and renamed Wiley Publishing, Inc. For purposes of clarity, we refer to the company as IDG when discussing all time periods prior to its September 2001 purchase by John Wiley & Sons, Inc. Wiley asks us, in a footnote, to dismiss John Wiley & Sons, Inc. as a party defendant because Wiley Publishing, Inc. is the actual employer of Sublett. However, such a request requires a separate motion and is not properly made through a footnote. Since no motion to dismiss was filed, the sparring on the issue in briefs filed in support or response to this motion for summary judgment was clearly a waste of time and effort.

four new positions, all titled Senior CCR. Ms. Pickens, who supervised Ms. Sublett, encouraged her to apply for one of the new senior CCR positions. However, Ms. Pickens was fired from her job before the new CCR positions were filled and thus played no role in deciding who would be promoted.

Ms. Sublett did apply for a promotion to one of the new positions, but was not selected. Senior Manager of the Customer Care Department, Linda Perkins, and Team Leader, Breea Hosier, interviewed the candidates for the senior CCR jobs and filled three of the positions with white employees. Ms. Perkins and Ms. Hosier testified that they did not select Ms. Sublett to fill the fourth spot because of what they perceived to be a problem in her working relationship with fellow employee, Vicki Bess, and also due to Ms. Sublett's lack of enthusiasm during the interview.

Ms. Sublett believed she was qualified for the Senior CCR position. In addition, although neither Hosier nor Perkins had acted in a manner which made her believe that her race had motivated their decision, because she was more senior than some of the white employees who were promoted, she came to believe that discrimination had played a role in the decision not to promote her. Therefore, she contacted a member of IDG's Human Resources Department via e-mail on July 24, 2000, inquiring as to the steps she should take if she felt she had been discriminated against in connection with her pursuit of one of the open positions. Chad Secrist, a manager in the Human Resources Department, responded informing Sublett that she should take time to write out her specific concerns in detail so that she would be prepared to discuss them with Sherry Marcuson, another employee in the Human Resources Department who handled this type of complaint. Ms. Marcuson then promptly followed-up with Ms. Sublett by scheduling a meeting at which they discussed Ms. Sublett's concerns.

After meeting with Ms. Sublett, Ms. Marcuson spoke with Ms. Hosier and Ms. Perkins to determine why they had not chosen Sublett for promotion. After learning of their views regarding Ms. Sublett's lack of enthusiasm and their perception that she and co-worker Bess had problems working as a team, Ms. Marcuson brought in Ms. Sublett to allow her to hear from Hosier and Perkins their reasons for not selecting her. Sublett was apparently able to convince everyone that she and Bess had no problems and were, in fact, friends. In addition, she indicated that if she were not actually enthusiastic about being promoted to the new position, she would never have pursued her complaint over being rejected as far as she had. Ms. Sublett's responses to the reasons proffered for not promoting her convinced Ms. Hosier and Ms. Perkins that their prior decision had not been well founded and, in a reversal, they concluded that Sublett should be promoted. Ms. Sublett was thereafter promoted to Senior CCR, effective August 21, 2000.

In September of 2001, Ms. Sublett received her annual performance review, drafted by Hosier and reviewed and signed by both Hosier and Perkins. Based on the review, Sublett received a 4% salary increase. The 2001 review rated her performance as "proficient" in all six categories examined. The rating options were "outstanding performance," "exceeds performance expectations," "proficient" and "needs improvement." Her previous written review, issued in June of 2000, listed Perkins as the reviewing manager and was also signed by Lou Peragallo, as head of the department. The 2000 review utilized a form different from the 2001 form: it incorporated a three-option grading scale

of "superior performance," "competent performance/developing performance" and "performance does not meet expectations." Out of forty evaluative descriptors applicable to her position in 2000, Sublett's work was rated as "superior performance" in three, and "competent performance/developing performance" in the other thirty-seven.

Wiley restructured the Customer Care Department in February 2002, establishing four teams correlated with specific product lines or channels. Each team consisted of a team leader, a senior CCR and one or two CCRs. The team leader had increased supervisory responsibilities under the new structure, including responsibility for monitoring the progress of special projects. At the time of the restructuring, two team leader positions were created, a day shift position for the "mass markets channel" and a night shift position for the "Wiley product line." When the restructuring was announced, the department was informed that anyone interested in those two positions should notify Breea Hosier. Sublett informed Hosier that she was interested in the day shift team leader position. Hosier returned later and told Sublett that they would not be promoting her to that position because they did not think she was ready yet for those responsibilities.

A total of five employees had indicated an interest in the day shift position that Sublett had sought consideration for, four white employees and Sublett, who is African American. Hosier and Perkins selected Mary Roberts to serve as the "mass markets" team leader. Roberts had a college business degree, past special projects experience at IDG/Wiley and supervisory experience prior to joining the company. According to Perkins, Roberts had been a strong performer as a CCR and senior CCR, excelling in her attention to detail.

Perkins and Hosier did not regard Sublett as having a similar level of experience or education and perceived her to have exhibited less initiative and leadership than Roberts.

During the first week of June 2002, Ms. Sublett interviewed for an opening as a customer care team leader for the "Jossey–Bass" product line. Again, Hosier and Perkins were the supervisory team assigned to interview and choose the team leader. In addition to Sublett, they considered four other candidates for the position, three Caucasian and one Hispanic. Perkins and Hosier informed Sublett at her interview that they were looking for someone to take a real leadership role with this team and that they did not believe she had been demonstrating leadership in her current role. They did not promote Sublett to the open position, choosing instead to hire a Caucasian candidate from outside the company, one Michael Shoptaw, who had seven years of prior customer service experience with other companies, nine years of supervisory experience with Mayflower Transit, an associates degree in business from Vincennes University, and had taken several courses in marketing at Ball State University.

On June 12, 2002, Sublett sent a memo to Marcuson in the Human Resources Department and to the Director of Human Resources, Sallie Vicino, complaining that she did not receive the promotion to team leader and that all Hosier and Perkins repeatedly tell her, in terms of explaining their adverse decisions, is that she lacks leadership skills. She stresses in the memo that she has in fact demonstrated leadership skills and criticizes Wiley's failure to have promoted her back in February as well. She contends further that training would be necessary for Shoptaw because he would be coming to the department from outside the company. Though

she does not raise race discrimination in her memo, Ms. Sublett filed a charge of discrimination with the Equal Employment Opportunity Commission three days later alleging race discrimination in connection with the failure to promote her to team leader both in June and in February of that year.

A meeting to discuss Ms. Sublett's complaints was held on August 8, 2002 with Sublett, Hosier, Perkins, Marcuson and Vicino attending. Ms. Sublett was given a chance to reiterate her concerns regarding her lack of progress at Wiley and the specifics with respect to her belief that she was the victim of discrimination in the selection process for team leaders. Perkins explained the reasons she and Hosier did not believe Sublett was ready to assume the responsibilities of team leader and the basis for their conclusion that the people they had hired were more qualified than Sublett. After this meeting, Sublett was presented with a Development Plan setting out the areas she needed to address in order to move up in her career with the company.

On September 25, 2002, Sublett received her annual performance review. The review form called for one of four ratings in six categories. The categories were "communication skills", "quality & quantity of work", "problem solving & decision making", "innovation, initiative & creativity", "organizing skills" and "teamwork & cooperation". The rating options were "substantially exceeded", "fully met", "acceptable with qualifications" and "less than acceptable." Ms. Sublett received a rating of "acceptable with qualifications" for all of the categories except "quality & quantity of work" and "organizing skills," for which she received a rating of "fully met." A 3%

increase in salary resulted from her yearly review.

On October 21, 2002, Sublett prepared a second charge of discrimination, filing it a couple days later with the EEOC as an "amended charge" to reflect the added claim of retaliation. In her "amended charge," Sublett details her race discrimination complaint which she made to Wiley in the summer of 2000 and opines that her 2001 performance review and lack of promotion to team leader in 2002 were either discriminatory or retaliatory. She also modified that part of the charge form calling for the complainant to set forth the earliest and latest dates of discrimination to reflect the earliest date as July 2000 and the latest date as October 2002.

Also on October 21, 2002, Hosier and Perkins interviewed Sublett for another open team leader position. Following that interview, Sublett was asked to interview with Lou Peragallo, then-Vice President for Operations. This time, the result of the interviews was favorable for Sublett and Human Resources was notified on October 29, 2002 that Sublett would be promoted. Neither Hosier, Perkins or Peragallo knew of Sublett's second charge of discrimination when the decision was made to promote her to team leader. She received the promotion to team leader effective November 4, 2002, which carried with it a 5% raise in salary.

After receiving her right to sue letter from the EEOC, Ms. Sublett brought suit in this court on March 7, 2003, pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.[3] Her complaint alleges race discrimination and retaliation in connection with her receipt of

---

**3.** The same standards govern liability under both statutes. *Bennett v. Roberts,* 295 F.3d 687, 697 (7th Cir.2002).

poor performance reviews and the failure to promote her on certain prior occasions during her career.

## Analysis

It is a rare civil rights employment case where a plaintiff has direct evidence of discrimination on the part of an employer because such direct evidence would essentially be an admission of discriminatory intent and employers who do discriminate are rarely so blatant. *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263 (7th Cir.2004). This is not one of those rare cases. Consequently, Ms. Sublett must draw on the available circumstantial evidence, such as inappropriate behavior or comments aimed at others in the protected group, suspicious timing or inconsistent explanations to establish a basis for proceeding under the procedural template first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ A prima facie case of race-based employment discrimination under a *McDonnell Douglas* analysis requires proof that: 1) plaintiff is a member of a protected class; 2) she has met her employers legitimate expectations with regard to job performance; 3) she suffered an adverse employment action; and 4) other similarly situated employees outside the protected class have been treated more favorably. *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir.2002).

■ To establish a prima facie case of race discrimination in a failure to promote context, Sublett must show: 1) she is a member of a protected group; 2) she was qualified for the position sought; 3) she was rejected for the position; and 4) the employee promoted was not a member of the protected group and was not better qualified than the plaintiff. *Johnson v.*

*Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir.2001).

■ To move forward with a claim of retaliation, evidence must be proffered by Sublett to support the following elements: 1) she engaged in statutorily protected activity; 2) she performed her job according to her employer's legitimate expectations; 3) despite her satisfactory job performance, she suffered an adverse employment action; and 4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 531 (7th Cir.2003).

■■ Once Sublett establishes a prima facie case as to each theory of entitlement to relief, it is incumbent upon Wiley to produce a nondiscriminatory reason for the employment action. *Traylor v. Brown*, 295 F.3d at 788. If that occurs, Sublett must then present sufficient evidence to enable a trier of fact to find that Wiley's explanation is pretextual. *Id.* In order to establish pretext, a plaintiff must show that the reason given by the employer is a dishonest one, not just an error. *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir.2002). Pretext means deceit utilized to cover the truth, which is more than an unusual conclusion or curious business decision by the employer. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir.2002). Therefore, Sublett must offer sufficient evidence to support a conclusion that Wiley's articulated reason for the alleged discriminatory action or inaction either: 1) had no basis in fact; 2) did not actually motivate Wiley to its decision; or 3) was insufficient to motivate Wiley. *Id.*

### A. *Failure to Promote*

During the pendency of this motion the Supreme Court decided the case of *Jones*

*v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 124 S.Ct. 1836, —— L.Ed.2d —— (2004), and found the appropriate statute of limitations for a claim of discrimination under 42 U.S.C. § 1981 to be four years. Prior to the decision in *Jones,* the statute of limitations applied in this circuit was two years. Consequently, Plaintiff recently submitted the *Jones* decision as supplemental authority, arguing that the delay in making her a senior CCR in 2000 should now be considered as an actionable adverse employment action (at least under the § 1981 theory of recovery), instead of just evidence of past discrimination.

However, there are a few problems with Ms. Sublett's effort to add the delayed promotion in 2000 as a basis to find Wiley liable for discriminatory failure to promote. First, she obtained the promotion promptly upon questioning the decision and the record is not clear as to how much of a delay there was between the point in the summer of 2000 when she believes she should have assumed the senior CCR position, absent alleged discrimination, and August 21, 2000 when she became a senior CCR. Certainly, the delay was not particularly significant. Second, there is no reason to disbelieve the nondiscriminatory reason offered for her failure to receive the promotion immediately. Sublett acknowledges in her own testimony that neither Hosier or Perkins spoke or acted in any manner which suggested that racial bias entered into the decision making process in 2000. They were of the opinion that Ms. Sublett and Ms. Bess did not get along well and, as a result of her interview, they felt Sublett was less than excited about the prospect of becoming a senior CCR. As soon as it was made clear to them that Bess and Sublett were on good terms and Sublett sincerely wanted the promotion, she received the promotion. Finally, Wiley was not Plaintiff's employer at the time. Her employer was either IDG or Hungry Minds. The status of either company is unclear from the record, but we know neither is a named defendant in this action at this point. So, the addition of two years to the statute of limitations does not assist Ms. Sublett in her case against Wiley.

 Sublett claims that she has established a prima facie case of discrimination and retaliation with respect to Wiley's failure to promote her to one of three open team leader positions in 2002. She includes in those three, the night shift team leader position for the "Wiley product line," for which she did not apply. When an employer requests that those interested in filling a position make that interest known to the hiring authority, part of a plaintiff's proof in a failure to promote claim must be that she applied for the position. *Von Zuckerstein v. Argonne Nat. Laboratory,* 984 F.2d 1467, 1472–1473 (7th Cir.1993). Sublett's response is that she did not tell anyone at Wiley that she was *not* interested in the night shift position.

Both positions were available in February 2002, yet Sublett specifically told Wiley that she was interested in the day shift team leader position. The fact that she did not specifically state that she was not interested in the night shift position or that Wiley did not consider her for the night shift after Wiley chose someone else for the day shift promotion does not overcome the requirement that she actually apply for the promotion she claims she was not given because of her race. Therefore, she may not proceed with a claim of discrimination for the failure to promote her to the night shift position.

That leaves for examination the promotion to team leader on day shift in February of 2002, which position was awarded to Mary Roberts, and the June

2002 hiring of Michael Shoptaw to fill the team leader position for the "Jossey–Bass" product line. The circumstantial evidence which Sublett claims supports her claim with respect to these positions includes: 1) the previous discriminatory failure to promote her in 2000 to senior CCR and her complaint of discrimination with respect to that decision; 2) the history of discrimination on the part of Wiley toward African–Americans; and 3) her superior qualifications for the team leader positions. As we explain below, there is a lack of evidence to support the fourth element of Sublett's prima facie failure to promote claim and the remaining factual assertions Sublett makes are not grounded in admissible evidence.

The fourth element of a discriminatory failure to promote claim requires proof that the employee promoted is not a member of the protected class and is not better qualified for the position than the plaintiff. *Johnson v. Nordstrom, Inc.*, 260 F.3d at 732. Neither Mary Roberts nor Michael Shoptaw is African–American. However, their qualifications for the team leader position were undeniably superior to the qualifications of Sublett. The team leader position had a significantly larger supervisory component than the position of senior CCR. The job description rates supervisory experience as highly desirable and some college study as desirable. Sublett had no supervisory experience at the time she applied while Roberts had two years of supervisory experience and Shoptaw had nine years of such experience. In addition, Roberts had a bachelor of science degree in business and Shoptaw had an associates degree in business with additional study at Ball State University. Sublett's post-secondary education was limited to the eight-month program entitling her to receive certification as an administrative assistant.

Sublett contends that she had more seniority than Roberts and that she was clearly more outwardly motivated than Roberts, displaying more patience and initiative. She maintains that the fact that Roberts ultimately moved back to a senior CCR position confirms that she was not the right person for the job. Though it is not our role to second guess personnel decisions other than those arguably made for unlawful reasons, several responses are called for in response to Sublett's claims. First, there is no evidence that seniority was a factor Wiley used in determining who would make a good team leader. Second, the difference in seniority at Wiley between Roberts and Sublett was only four months, and Roberts actually had been a senior CCR a couple of weeks longer than Sublett. Robert's 2001 performance review was more favorable than Sublett's and, further, Sublett's own interpretations of her performance, or of the characteristics she possessed that Roberts lacked, are of no moment when comparing objective qualifications. Finally, the fact that Roberts eventually returned to the senior CCR position does not support a conclusion that she was less qualified for the job she was leaving, especially when there is no admissible evidence as to what prompted her move. Importantly, Sublett's self-serving assessments of her qualifications for a promotion are only relevant when compared to the qualifications of Roberts at the time the promotion decision was made, not after the fact on the basis of additional experience or information. *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir.2003).

Sublett's argument with regard to Wiley's selection of Shoptaw to fill the team leader opening in June of 2002 is similarly unconvincing. Unable to overcome the objective superiority of Shoptaw's qualifications, Sublett contends that because Hosier and Perkins had indicated that they

hoped to promote from within the company and, as an "in-house" candidate, she was the best qualified because of her knowledge of the company and its operations, she should have been selected. While Shoptaw was not a Wiley employee prior to being offered and prior to accepting the position as team leader, his supervisory experience and educational background were significantly greater than Sublett. In addition, though Wiley initially may have hoped to find someone of superior experience and education within the company, prior employment with Wiley was clearly not a prerequisite because it advertised for applicants in the local paper and Wiley's failure to hire from within is not in and of itself evidence of race-based discrimination against Sublett.

 Even if we were satisfied that Sublett had met her burden of establishing a prima facie case of discriminatory failure to promote, Wiley's nondiscriminatory reason for not promoting her stands without contradiction; there is simply no evidence of pretext. Hosier and Perkins' reasons for turning down Sublett in February and June of 2002 for the team leader positions reflected their view that she had not demonstrated the kind of leadership skills that would indicate that she was ready to assume the team leader responsibilities. Compared to the supervisory and educational experience levels of those who received the jobs, Sublett was demonstrably less qualified. Finally, Sublett's allegation that there had been some type of historic, ongoing discrimination by Wiley against her and other African–Americans and in

particular by Perkins and Hosier lacks admissible evidentiary support.

 Sublett maintains that Perkins, in particular, rarely hired or promoted African–Americans, yet the evidence reflects that Perkins was one of the two decision-makers who hired her and that Sublett specifically testified in deposition that she believed she was hired because she was African–American. Further, Sublett provides no statistical data of application-to-hiring ratios which would support her conclusions. Rather, her assertions appear to reflect nothing beyond her own opinions, with the possible exception of the conclusory affidavit of Felicite Pickens who, in addition to opining that she, too, was treated less favorably because of her race, claims that Perkins and Hosier spoke less to African–Americans, hired fewer African–Americans and criticized African–Americans more often. To the extent these perceptions by Pickins are shared by Sublett they remain only broad stroke suppositions. They certainly lack any grounding in personal knowledge, since it would be an impossibility for either to have full knowledge of all of Hosier's and Perkins' interactions with all of Wiley's African–American employees and applicants. The subjective perceptions and beliefs of Sublett and Pickens, who, it should be noted, was an employee of Wiley for only a matter of months nearly two years prior to the 2002 team leader promotion decisions, with regard to Wiley's alleged, general bias in favor of Caucasians, does not suffice without more, to establish pretext.[4]

---

4. In an attempt to further support these general overall allegations of racial bias, Sublett offers up examples of stray comments by non-decision makers, such as Marcusson's comment: "I don't like black people," which Secrist apparently overheard but says may have related to work problems or Marcusson's ongoing marital problems of which she con-

stantly complained (Marcusson was married to an African–American); and Peragallo's statement that his boss would want any receptionist hired to have an "ethnically neutral voice." Sublett also offers a handwritten note which was attached to an employment application which was dropped off at the Wiley receptionist desk. The note, addressed to

In examining the subject of pretext, it is the perception of the decision makers that is relevant. *Little v. Illinois Dept. of Revenue,* 369 F.3d 1007, 1013 (7th Cir.2004); *Adreani v. First Colonial Bankshares Corp.,* 154 F.3d 389, 398 (7th Cir.1998). Ultimately whether Hosier and Perkins's decision on the merits of the respective applicants was the right one or the wrong one does not matter. Nor does it matter if they overlooked Sublett's favorable traits and strong qualifications. What does matter is the genuineness of their motives, and that they were race-neutral. *Adreani,* 154 F.3d at 398. In that regard, Sublett offers no basis on which to question the veracity of Hosier and Perkins' proffered grounds for promoting Roberts and hiring Shoptaw, as opposed to promoting Sublett.

The analysis with regard to pretext applies equally to any claim that the failure to promote Sublett to team leader was in retaliation for her complaint lodged in the summer of 2000 that discrimination may have played a role in her not being promoted to a senior CCR position. While we disagree with Wiley's contention that Sublett has failed to make out a prima facie case of retaliation because her e-mail to Secrist and subsequent meeting with Marcusson (and later others as well) did not constitute protected activity, we agree that in the final analysis there is no real evidence of pretext advanced by the Plaintiff.[5]

Finally, we conclude that too much time passed between the July 2000 exploration of reasons for her failure to receive a senior CCR position and the February 2002 promotion of Roberts to team leader for any telling temporal connection to exist from which the required casual relationship could be inferred. *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir.1998). Sublett offers nothing, other than her own perception, to establish such a causal relationship between her summer 2000 complaint and her failure to be promoted in 2002. This defeats her retaliation claim as well.

### B. *Poor Performance Evaluations*

Sublett also claims that her performance evaluations in 2001 and 2002 "falsely criticized her." She believes those evaluations to have been much worse than the one she received in 2000 and reflect unfair grading of her performance based on her race or because she complained of race discrimination. Her basis for believing these evaluations reflect discrimination is her own positive assessment of her work and the difference between ratings received in 2000 and those received in 2001 and 2002. Her evidence of retaliation is limited to her assertion that, although the 2001 evaluation was completed more than 13 months following her complaint of discrimination in the summer of 2000, it was

Sherry Marcusson in Human Resources, states "Attn Sherry—Customer Service Position—Walk in—drop off. 9/23 Caucasian/female." (Marcusson responded by affidavit that the race of those making application to Wiley is kept for affirmative action tracking purposes since Wiley is a government contractor, but any notation of race is destroyed after the information is entered into the tracking records.) Sublett also points to other comments made and actions taken which she believes were insensitive to women and homosexuals. None of these comments or incidents however, were related in any way to Sublett, nor did they involve the people who made the promotion decisions.

5. We have some reservations as to whether Sublett has offered evidence that would allow us to find that Roberts and Shoptaw were similarly situated to her, in light of the significant differences in supervisory experience and educational background between them and the Plaintiff, but that argument has not been raised by Wiley and therefore we need not examine the issue more closely.

the first chance that Hosier and Perkins had a chance to retaliate.[6] The 2002 performance review which was also unfairly negative was completed only a few months after she again had taken issue with the decision not to promote her to the team leader positions.

■ Wiley argues that these claims by Sublett fail on multiple levels, and we agree. First, Sublett's opinion of her own performance simply can not trump the evaluation of those she reports to. To find otherwise would run the risk of requiring the courts to be super personnel departments reviewing performance evaluations every time an employee felt strongly enough to file a lawsuit or a charge of discrimination. An employee's own assessment of her performance does not provide a window into the mind of the decision-maker; evidence must be adduced to support a finding that the performance evaluators did not believe that the employee's performance was as assessed but assigned the grade or set forth unfair criticism because of a plaintiff's race. *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir.2001). That does not exist here.

Next, we find it difficult to characterize the evaluations of 2001 and 2002 as "negative". Negative is, of course, relative and, while Sublett thinks her 2001 and 2002 evaluations were significantly less favorable than the one she received in 2000, the variations in the forms used in each of these three years make comparisons between and among them unreliable. In none of the three reviews was Sublett's performance in any area found to be less than acceptable. While in 2000 she enjoyed a superior rating in three categories, there were a total of forty evaluative categories with three qualitative options in each, and she received the middle grade, "competent/developing," in the remaining thirty-seven categories as well as for her the overall assessment. The written comments on the review were in fact quite positive, though admittedly they also included several "I would like to see" comments clearly meant to coax improvement.

In 2001, the evaluation form was reduced to six categories and grading options were expanded to include four alternatives. Sublett received identical grades ("proficient") in each category, which is a step above the lowest rating of "needs improvement." This evaluation contained more written comments than before, urging performance improvements, but there were certainly positive comments as well. Perhaps most noticeable in these forms are the critical comments regarding Sublett's adjustment to her role as a senior CCR, which was the promotion she received the previous year. These critical comments, however, reflect the lack of comparative value courts have noted vis-a-vis earlier reviews evaluating performance in a different job. *Massey v. Blue Cross–Blue Shield of Illinois*, 226 F.3d 922 (7th Cir.2000).

Her 2002 review was completed on yet another form.[7] Like the 2001 form, there were six categories and four different grades. In 2002, two of the four perform-

---

6. Sublett's complaints regarding the 2001 evaluation are timely under the limitations period applicable to claims under 42 U.S.C. § 1981.

7. Wiley claims that the "amended charge" filed by Sublett does not specifically address the 2002 review. On this claim, Wiley contends, she has failed to exhaust her remedies and cannot obtain review in this lawsuit. We disagree. The charge adequately alleges that she has not been promoted or reviewed fairly because of her race and the date listed for the latest act of discrimination is consistent with the time period during which she received the 2002 review.

ance ratings were "fully met," which was the second highest of the four ratings, and four ratings were "acceptable with qualifications," the third highest rating. Again, the written comments included both favorable statements and criticism in areas for which improvement was sought. The 2002 review seems a bit better than the 2001 review and basically on par with the 2000 review.

In summary, an objective review of Sublett's evaluations year-to-year do not arouse suspicions of inaccuracy or, more importantly, animus or prejudice. We simply are unable to accept Sublett's portrayal of either the 2001 or 2002 review as being inexplicably lower than the review she received in 2000 or the review she deserved to receive.

Even if we were to view the evaluations as significantly more harsh than the 2000 review or to find that they effected her career at Wiley adversely (see discussion, *infra*), Sublett has adduced no evidence causing us to doubt the non-discriminatory reasons offered by Wiley for the performance evaluations given her. Hosier and Perkins testified that they believed at the time the performance reviews were prepared and issued that each of the evaluations accurately reflected their shared assessment and concerns regarding Sublett's performance during the year at issue. No evidence of record calls that into question.

■ Further, the timing of the reviews is such that no temporal nexus exists between them and the summer 2000 complaint by Sublett of potential race discrimination. Thirteen months passed between the dates of the complaint and the first review. And, while Sublett did file her charge of discrimination with the EEOC in June of 2002, the 2002 performance review which she received in late September was clearly more favorable than the 2001 review, negating any inference of potential retaliation. Sublett simply has not provided any evidence which would support a finding of pretext, assuming that she had made out a prima facie case with respect to the 2001 and 2002 evaluations.

■ Both the 2001 and 2002 reviews were accompanied by raises in salary. Sublett offers no evidence that others in her position received higher raises in either of the years. Nor does she point to any detriment in her career progress caused by the allegedly "falsely critical" reviews. While in comparing the distinctions between Roberts and Sublett, Wiley did point out that Roberts' review in 2001 was higher than Sublett's, that review did not prevent Sublett from being considered for promotion; in fact, she was promoted to team leader later in 2002. In addition, the review was not a significant factor, compared to supervisory experience or education, in the selection process for the team leader positions Sublett did not achieve in 2002. The Seventh Circuit has made it clear that, absent some tangible job consequence, the receipt of a low performance evaluation does not constitute an adverse employment action. *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir.1998); *Smart v. Ball State University*, 89 F.3d 437, 442 (7th Cir.1996). Consequently, we conclude that Sublett has failed to establish a prima facie case with regard to discrimination or retaliation.

### Conclusion

For the reasons discussed, Defendants' Motion to Strike Plaintiff's Surreply is DENIED. Defendants' Motion for Summary Judgment is GRANTED and judgment in favor of the Defendants shall issue.